IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,503

STATE OF KANSAS,
*Appellee*,

v.

CORBIN J. BREITENBACH,
*Appellant*.

SYLLABUS BY THE COURT

1.

The authorization of expert services for an indigent defendant in a criminal trial lies within the discretion of the district court. The decision will not be disturbed unless the defendant shows abuse of the trial court's discretion which results in prejudice to his substantial rights.

2.

When considering whether to grant a self-represented defendant's request for an expert, the district court must first determine that the defendant is financially unable to pay for the services, and then find that the requested services are necessary to an adequate defense.

3.

Requests for the appointment of experts are to be measured by the requirements of the due process test of fundamental fairness.

1

4.

Fundamental fairness does not require the court to furnish the defendant with equal amounts of funds and services as are within the reach of the State.

5.

Defendants do not have an absolute right to independent testing on mere request, but must make a specific showing of need, i.e. that it is necessary to an adequate defense.

6.

To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel. When the defendant's dissatisfactions emanate from a complaint that cannot be remedied or resolved by the appointment of new counsel, the defendant has not shown the requisite justifiable dissatisfaction.

7.

The defendant bears the burden of establishing the district court abused its discretion by refusing to appoint new counsel.

8.

Our state and federal Constitutions guarantee criminal defendants the right to effective assistance of counsel, but they do not guarantee the defendant the right to choose which attorney will be appointed to represent them.

9.

If a conflict arises from counsel's refusal to introduce truthful, relevant evidence because they believe their client is guilty, newly appointed counsel can be necessary. But a defense attorney's personal belief in the guilt of their client does not immediately

necessitate newly appointed counsel when that defense attorney continues to competently conduct a constitutionally adequate defense.

10.

The appointment of standby counsel for a pro se litigant rests within the sound discretion of the trial court.

11.

The district court's determination of a *Brady* violation is a legal question which is reviewed de novo with deference to any factual findings. But the district court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard.

12.

There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

13.

Delayed rather than absent disclosure of exculpatory information might qualify as a *Brady* violation, depending on whether the defendant can establish prejudice due to his inability to use the *Brady* material effectively.

Appeal from Sedgwick District Court; JOHN J. KISNER JR., judge. Opinion filed March 26, 2021. Affirmed.

3

*Clayton J. Perkins,* of Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: This is a direct appeal of criminal convictions after jury trial for attempted capital murder, aggravated criminal sodomy, and aggravated burglary. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Late one evening, the parents of L.A. dropped her off, along with her younger brother, at the apartment of a friend, Elizabeth "Lisa" Brandyberry. L.A. was seven years old at the time. It was around 10 p.m. by the time the children arrived, so everyone immediately went to bed.

Brandyberry was wakened around 2:30 a.m. to the sound of L.A. crying in another bedroom. When she went to investigate, Brandyberry saw blood everywhere. She called 911.

L.A. was taken to the hospital for medical care and to undergo a sexual assault exam by trained Sexual Assault Nurse Examiner (SANE), Dana Loganbill. L.A. was able to tell Loganbill that she was at the hospital because she had been awakened by a man who looked kind of like her dad but without a beard or mustache and that the man choked her and did something to her private parts. L.A. told Loganbill she might have seen the man before but she did not know where.

4

Loganbill observed that L.A. was clearly distressed and in pain but also seemed to be dissociated at times, particularly during the genital exam. During the head-to-toe exam, Loganbill noted many injuries that she classified as remarkable. In particular, the strangulation injuries caused petechiae all across her face and ears, throughout her scalp, along her neck, and in her mouth and throat. In relation to strangulation, petechiae occurs when external pressure is placed on the neck which causes difficulty breathing and difficulty for blood to leave the head and neck. This causes overfill and distention in the capillaries, which causes them to burst and produce red spots. Loganbill had never seen that much petechiae in a child.

Before moving to the genital examination, Loganbill had to administer pain medication to L.A.—which is not standard—because of the severity of the injuries she felt she would encounter and because even movement was hurting L.A. Loganbill was only able to do partial external swabs before halting the exam because of the severity of the injuries. Loganbill decided to call in an OB/GYN to assess the injuries before continuing the exam.

Dr. Teresa Craddock, an OB/GYN, assessed L.A.'s injuries and testified that although she had worked with SANE/SART before in pediatric cases, she had never seen this severe of an injury on any patient. Before completing the surgery and while consulting with Loganbill, Dr. Craddock was able to collect the remaining necessary swabs.

Physical evidence was photographed, recorded, and collected from Brandyberry's apartment that same morning. Investigators found blood throughout the apartment, including in the bathroom, the bedroom where L.A. had been sleeping, and the balcony. They also found blood on the door and privacy wall of Brandyberry's balcony. Samples were collected from all these locations for the possibility of subsequent testing, and a

fingerprint was lifted from Brandyberry's balcony door. Inside the apartment, investigators found what they presumed to be semen stains on the couch and collected samples. The investigators clarified that the stains could not be confirmed to be semen without additional laboratory testing.

At this point, police had few suspects save for L.A.'s father, who officers interviewed that morning and who voluntarily turned over DNA and clothing samples when requested. Another individual of interest was Brandyberry's boyfriend, who was banned from the apartment by a PFA order, and who had broken into Brandyberry's apartment twice before. This individual was never contacted.

During the investigation, Detective Jason Waite, the lead detective assigned to L.A.'s case, contacted Sedgwick County Regional Forensic Science Center (the Science Center) and requested that the processing of the collected evidence be made a priority. Sarah Geering, a forensic scientist at the Science Center, was able to identify sperm cells on some of the samples and moved forward with testing two of them—the anal swab and the swab from the labia majora and clitoris. Geering obtained a sperm cell fraction from the latter, but it contained only a partial DNA profile and was deemed to be of no comparative value.

The anal swab, however, provided more useful scientific evidence. Geering found a DNA profile—which she uploaded to the Combined DNA Index System (CODIS) database to check against existing profiles linked to known individuals—to be a mixture of two individuals. The major contributor to that DNA profile was consistent with that of a previous Kansas offender, Corbin Breitenbach, while the minor contributions were attributable to L.A. Geering's statistical calculation showed that the probability of selecting an unrelated individual at random who would exhibit a profile that is the potential major contributor to the profile obtained from the sperm cell fraction of the anal

swabs is approximately 1 in 107 octillion. When questioned about prioritizing or expediting the testing, Geering stated that she did not have any concerns about the speed with which her analysis was conducted.

A few days later, Detective Waite interviewed Jessica Fowler, whom Breitenbach had been dating for about six weeks. Fowler lived in the apartment building adjacent to Brandyberry's and told Waite that Breitenbach had stayed there the night of L.A.'s assault. According to Fowler, she picked Breitenbach up from a bar around 1 a.m. that morning and they arrived back at her apartment by 1:30 a.m.

Upon returning home, Fowler let her dog out and sat on the steps of her apartment building while Breitenbach went for a run. Approximately 20 to 25 minutes later she saw Breitenbach walking back up the same way he came, and they went inside together. Fowler went straight to bed while Breitenbach went to the bathroom first but did not shower. Fowler remembers Breitenbach being sweaty as if he had been on a run like he said, but that he had not changed, he was not dirty, and she did not see blood on his clothes.

L.A. was taken to the Child Advocacy Center to determine if she could identify her attacker from a photo lineup. One at a time, she was shown photos and asked if she recognized them. On the third photo, L.A. pointed to Breitenbach and said, "That's him."

Breitenbach was arrested and taken to the Sedgwick County Jail. More evidence, including a pair of Reebok tennis shoes, was collected from the house he shared with his mother and grandmother. The Reebok shoes were submitted to the Science Center for testing and found to contain a blood stain with a DNA profile consistent with L.A. The morning after his arrest, Breitenbach made a call to his mother and grandmother during which he told them he was a monster, that it was all true about him, that he was

dangerous and could not control himself, that he hurt "her" so bad, and that he wanted forgiveness from them. The majority of the phone call recording was admitted and entered as evidence.

Breitenbach was charged with attempted capital murder, or in the alternative, rape, aggravated criminal sodomy, and aggravated burglary. At the preliminary hearing, Breitenbach was represented by Eli O'Brien from the public defender's office. A few months later, O'Brien notified the court that he was leaving the public defender's office and attorney Jason Smartt stepped in to represent Breitenbach. Breitenbach was unhappy about the transition but did not object to it.

Breitenbach subsequently filed multiple pro se motions, including a "Motion to Compel Judicial Notice of Ineffective Assistance of Court Appointed Trial Counsel" as well as a "Motion for Substitution of Attorney." His general complaints in the former included allegations that the public defender's office attempted to pressure or intimidate him into accepting a plea deal and that the constant switching of attorneys unduly delayed his trial. In the latter motion, he asked for relief from "ineffective counsel" and claimed there was a conflict of interest between himself and the entire public defender's office. His complaints against Smartt included not meeting with Breitenbach to discuss the merits of pro se motions, lying to the court about discussing motions with Breitenbach, and telling Breitenbach that the indigent defense budget would not cover additional DNA testing. Breitenbach argued that because Smartt would not seek expert analysis of the DNA evidence in an effort to conserve the indigent defense fund, it presented a conflict of interest with the whole public defender's office.

In a hearing on the motion, Breitenbach argued that the public defender's office's desire to save money was directly at odds with its ability to provide him with an adequate defense and that there was "extremely important" material that was yet to be tested.

8

Breitenbach also claimed that Smartt had lied to him about what his charges were, but when asked if he understood the charges against him and the potential sentence in the case, Breitenbach said that he was completely aware of them. Eventually the district court ruled that while it understood there could be disputes over what is important and what is not important, it found there was no valid ineffective assistance of counsel or conflict of interest claim. The district court further found that there was no fundamental right or requirement that additional testing be done if there was already a forensic test done by the Science Center and having a public-funded defense does not equate to an open checkbook for testing.

Just a few days later, Breitenbach filed another pro se motion, this time for "Reappointment of Counsel," in which he stressed to the court that there was no trust between himself and Smartt and that there had been a breakdown of communications. The motion alleged that after the prior hearing, Smartt had told Breitenbach, (1) "Just because I think your [*sic*] guilty doesn't mean I can't represent you," (2) "The Public Defender's Office doesn't want to waste any money on your case," (3) "I'm not even going to ask," (4) "I've known Judge Kisner a long time and he will never make me get off your case," and (5) "Nothing you do is going to change what I plan to do with your case."

The district court heard the motion. At this motion hearing, Breitenbach reiterated many of the same arguments made in his prior motions, including his concerns that the public defender's office would not pursue additional DNA in an effort to save money when they "just personally believe[d]" that it would not be productive. Further, he believed it was unethical or a breach of confidentiality for the office to contact his family and ask for them to pay the $4,000 required for testing. One of the new claims Breitenbach added in this hearing was that he believed the DNA testing was done in a rush.

9

The district court then cleared the courtroom of everyone except Breitenbach, court staff, and those with the public defender's office. Breitenbach was able to articulate that he believed additional testing would completely exclude him from all DNA results and that the current DNA results were false. In addition to retesting the vaginal and anal swabs, he also wanted testing to be done on fingernail scrapings, blood found on L.A., any swabs taken from L.A.'s neck, the potential semen stains from the couch, fingerprints lifted from the scene, and L.A.'s clothes. Breitenbach also reiterated that at the preliminary hearing, L.A. did not identify him and that there was certain evidence and statements L.A. made that implicated her dad. When asked by the court if there was some dispute with Smartt about that evidence coming in at trial, Smartt responded that there absolutely was a dispute but did not elaborate. Breitenbach argued that it was neglect on the part of Smartt not to pursue a very valid material defense strategy and that there was an "extreme disagreement" between himself and Smartt, partially because his theory of defense was that the dad was involved.

When asked for specific facts that showed a breakdown of communication, Breitenbach enumerated: (1) The statement that the public defender's office would not cover the $4,000 for DNA analysis; (2) Statements from Smartt along the lines of "just because I think you're guilty doesn't mean I can't represent you"; and (3) Smartt has known Judge Kisner a long time and "he would never make [Smartt] get off [Breitenbach's] case."

The district court asked Breitenbach to clarify what his basis was to believe that there was a problem with the testing that had already occurred because there needed to be a reason to double check rather than just a "fishing expedition." Breitenbach expressed that he believed the rushed nature of the testing combined with the fact that it was not collected by a certified SANE/SART examiner meant that it was not a high quality test.

10

He supported this with the fact that of the two tests done, one of them came back inconclusive. When given the opportunity to speak, Smartt had nothing to add.

Once everyone was back in the courtroom, the district court denied Breitenbach's motion for a number of reasons. In terms of the additional DNA testing, the court found that Breitenbach had not provided any legal foundation for retesting the existing DNA analyses and that the decision to test—or not test—additional samples could be a tactical decision to limit or forgo investigation rather than deficient performance.

Regarding Smartt's statement that he believed Breitenbach was guilty, the district court acknowledged that an irreconcilable conflict could exist if the attorney's belief in the defendant's guilt prevents them from utilizing potentially relevant evidence and/or truthful defense evidence. But honest opinions did not necessarily mean that the lawyer could not lawfully, ethically, and aggressively pursue theories of defense and zealously represent the client. Based on what the district court had seen of Smartt's actions, it found no basis for any conflict of interest, irreconcilable conflict, or complete breakdown of communication.

Upon denial of the motion, Breitenbach requested a stay of proceedings because he intended to proceed pro se, a decision he felt the district court had forced upon him. The district court went over the standard self-representation advisories with Breitenbach and expressed its opinion that this was a very bad idea. Breitenbach was given time to think the decision over, but at the next hearing he expressed that while he did not want to waive his right to representation, neither did he want Smartt to represent him; he ultimately decided to proceed pro se.

At that same hearing, Breitenbach requested standby counsel so he might have "some help." The district court denied that request. Breitenbach renewed his request for

11

standby counsel in another pro se motion and at a subsequent hearing in March. At that hearing, Breitenbach argued his own ignorance could place a burden on the district court or might cause delays in the proceedings, which might all be alleviated by the appointment of standby counsel.

The district court acknowledged this was a discretionary decision which it frequently faced—and struggled with—because it could make the court's job easier and there are often good arguments for appointing standby counsel. But it found that ultimately, there was nothing that would make standby counsel especially beneficial in this case and that Breitenbach was really requesting someone to act as cocounsel. It could find no basis in law which compelled it to appoint standby counsel.

Breitenbach also filed a motion for "expert services in accordance with K.S.A. 22-4508." At the hearing on that motion, the court cleared the courtroom of everyone except court staff, the sheriff's deputy, the court guards, and Breitenbach, so they could discuss Breitenbach's arguments for independent DNA testing.

Breitenbach told the court he had found a string of emails from Geering that indicated there was a technical problem with the computer software used to upload information, but he was unable to explain the specifics other than to say it caused a delay in the processing but was ultimately corrected. The court discussed the difference between alleging some flaw in the testing versus just being skeptical of the turnaround when a job is given priority. When asked if there were any other specific issues or flaws which Breitenbach felt needed to be pursued by the defense for a fair trial with regard to the DNA testing, Breitenbach said that because they tested the two best samples they had and one was inconclusive, there might have been some human error. But he also acknowledged he did not have any evidence to support that accusation and agreed with the court that it was a fishing expedition.

12

After the State was brought back into the courtroom, the district court expressed it would have to find a basis for questioning the reliability or accuracy of the State's DNA evidence in this case and it would not make the decision based on timing. Breitenbach clarified this time that he was not trying to get any samples retested, but he would like the untested swabs to undergo DNA analysis because he hoped for exculpatory evidence. In total, Breitenbach was requesting testing for three untested swabs from L.A.'s sexual assault exam, the potential semen stain on the couch, and biological material from the bedding where L.A. was found. The district court asked Breitenbach to be more specific with what testing he wanted done and the cost it would require, but Breitenbach struggled due to his lack of knowledge in the area. He eventually settled on a request of around $6,500 for testing with a projected timeline of 10 weeks to completion. Later in the same hearing, Breitenbach clarified that he had no idea DNA could be retested but "of course" he would want the other two samples retested.

The district court explained that this was a legal issue with courts on both sides of whether a defendant has a right to an expert witness and DNA testing because the State has one. The district court was persuaded by the fact that the State's DNA evidence was not tested by a private lab hired by a party in a civil case, but rather was conducted by a public, independent lab that—while it may have a close relationship with the district attorney because they work together all the time—could provide exculpatory or inculpatory information depending on the case. The district court provided a written order denying the motion, and the case proceeded to trial.

The jury found Breitenbach guilty of all charges. Prior to sentencing, Breitenbach filed a pro se Motion For A New Trial Pursuant to K.S.A. 60-259, alleging that the district court's denial of counsel, the denial of a DNA expert, the admission of prejudicial phone call evidence, and the withholding of exculpatory fingerprint analysis by the State all resulted in the denial of his due process rights. The court denied the request for new

13

trial. Breitenbach was sentenced to life with the possibility of parole after 592 months for the attempted capital murder conviction, life without the possibility of parole for the aggravated criminal sodomy conviction, and 172 months' imprisonment for the aggravated burglary conviction with each of the sentences to be served consecutively. Breitenbach appealed to this court. We will review his appellate issues in turn.

ANALYSIS

I. DID THE DISTRICT COURT ERR IN DENYING BREITENBACH'S REQUEST FOR INDEPENDENT DNA TESTING?

Breitenbach first argues that the district court erred in denying his request for additional DNA testing under K.S.A. 22-4508 and that the error constituted an abuse of discretion when the judge relied on incorrect law, made incorrect statements of fact, and ruled unreasonably.

*Standard of review*

The authorization of expert services in a criminal trial of an indigent defendant lies within the discretion of the district court. The decision will not be disturbed unless the defendant shows abuse of the trial court's discretion which results in prejudice to his substantial rights. *State v. Owens*, 248 Kan. 273, 282, 807 P.2d 101 (1991).

"A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact." *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

14

*Discussion*

When a criminal defendant wants expert services but cannot afford to retain them, he must ask the court to order the government to pay for the services. In this case, that motion was first filed by Breitenbach while he was self-represented, and not while he was represented by a public defender. For reasons that will be discussed, that is significant to the analysis. Breitenbach asked the court for expert services in the form of DNA testing.

When considering whether to grant a self-represented defendant's request for an expert, the court considers K.S.A. 22-4508, which reads in relevant part:

> "An attorney other than a public defender who acts as counsel for a defendant who is financially unable to obtain . . . expert . . . services necessary to an adequate defense in the defendant's case may request them in an ex parte application addressed to the district court where the action is pending. Upon finding, after appropriate inquiry in the ex parte proceeding, that the services are necessary and that the defendant is financially unable to obtain them, the district court shall authorize counsel to obtain the services on behalf of the defendant."

Here, the "attorney other than a public defender" is Breitenbach himself, acting pro se. The statute provides a simple two-part test. The district court must first determine that the defendant is financially unable to pay for the services, and then find that the requested services are necessary to an adequate defense. If both these requirements are met, the district court shall authorize the services. *Landrum v. Goering*, 306 Kan. 867, 874, 397 P.3d 1181 (2017).

*The two-part test—indigency and necessity*

Clearly, Breitenbach satisfies the first prong of the test. He is indigent. The district court had found him so and appointed the public defender to represent him before the expert request was made. Though Breitenbach rejected the appointment of counsel in favor of self-representation, that election to proceed pro se did not affect his status as an indigent defendant.

The issue turns, then, on whether Breitenbach can establish that a DNA expert was necessary for his adequate defense. To arrive at the answer, we analyze what the law means in this context.

Kansas precedent directly on point for this issue is scarce. However, this court previously held that K.S.A. 22-4508 is comparable to the federal provisions of 18 U.S.C. § 3006A(e) and found there is no general constitutional requirement for experts. Rather, this court approved federal findings which hold that requests for the appointment of experts are to be measured by the requirements of the due process test of fundamental fairness. *State v. Dunn*, 243 Kan. 414, 419, 758 P.2d 718 (1988); *State v. Lee*, 221 Kan. 109, 113-14, 558 P.2d 1096 (1976).

Fundamental fairness does not require the court to furnish the defendant with equal amounts of funds and services as are within the reach of the State. *Lee*, 221 Kan. at 114. In *Lee,* as in this case, the defendant was denied a DNA expert. The court found no abuse of discretion for the court's refusal to order such expert, implicitly approving a standard which found reversal for denial of expert services is only warranted where a defendant has established prejudice by clear and convincing evidence. *Lee,* 221 Kan. at 115 (citing *Mason v. Arizona*, 504 F.2d 1345 [9th Cir. 1974] [as applied to investigative services]).

16

In the case before us, the State offers legal authority from the 10th Circuit which it suggests is useful in shedding light on how courts ensure fundamental fairness as discussed in *Lee* and *Dunn*. In particular, the 10th Circuit has "repeatedly emphasized that defendants must provide the district court with explicit detail showing why the requested services are 'necessary' to an adequate defense and what the defendant expected to find by using the services." *United States v. Gonzales*, 150 F.3d 1246, 1252 n.4 (10th Cir. 1998). The 10th Circuit also establishes that the standard for being "necessary" means that the requested services must be more than merely "helpful." *United States v. Kennedy*, 64 F.3d 1465, 1470 (10th Cir. 1995).

Breitenbach argues this court should reverse its holding in *Dunn* and *Lee* and find there is a constitutional right to defense experts in general—and specifically to DNA experts—by expanding and adopting the holding of the United States Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). *Ake* acknowledged:

> "This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." 470 U.S. at 76.

*Ake* dealt with a capital crime. The defendant lodged an insanity defense and asserted the right to a psychiatric expert. The Supreme Court held that due process requires the appointment of defense experts when a defendant has made a preliminary showing that his or her sanity at the time of the offense is likely to be a significant factor

17

at trial. *Ake*, 470 U.S. at 74. Breitenbach acknowledges that Kansas has not adopted *Ake* as applying to nonpsychiatric services but argues that many jurisdictions have.

This court declines to expand *Ake* to a DNA expert evaluation. Psychiatry and DNA evaluation involve very different analyses. Identification of DNA, as in identification of a fingerprint, requires a specific scientific procedure. Even acknowledging there can be error in DNA analysis and that it is not infallible, the process is, at its base, more objective.

> "Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party." *Ake,* 470 U.S. at 81-82.

Breitenbach asserts the district court's standard was too strict, arguing the court unnecessarily required a showing that the State's DNA evidence was unreliable or inaccurate before it would authorize DNA testing, citing *State v. Snodgrass*, 252 Kan. 253, 843 P.2d 720 (1992), and *State v. Reynolds*, 230 Kan. 532, 639 P.2d 461 (1982). But this mischaracterizes the district court's reasoning in denying the motion, which is demonstrated by the written ruling contained in the record.

In that ruling, the district court identifies a thorough understanding of the applicable law. It references the controlling statute quoted above and identifies that Breitenbach must show the testing is necessary for an adequate defense. The district court correctly identifies that while some courts rely in part on *Ake* to support the idea that a defendant has the right to obtain public funding with little more than a request, *Ake* did

not create a universal rule that an indigent defendant is entitled to an expert for every scientific procedure. The district court also correctly identifies that Kansas is one of the jurisdictions that requires the defendant to make more than just a request and relies on *Snodgrass* and *Reynolds* to show Breitenbach must make a specific showing of need for the expert, i.e. that it is necessary to an adequate defense.

When the district court said Breitenbach did not set forth any valid basis to question the reliability or accuracy of the State's DNA, it was specifically referring to Breitenbach's request to *retest* the two samples already processed by the State. In other words, the district court was asking for a reason why the retests were necessary. It addressed new testing separately and noted that it had previously heard evidence independent of the DNA testing, including Breitenbach's statements to his mother and grandmother that he hurt the girl; L.A.'s identification of Breitenbach as her attacker in a photo lineup; evidence of L.A.'s blood on Breitenbach's shoe; and evidence that Breitenbach was in close proximity to the scene of the crimes. Further, Breitenbach failed to articulate any reason testing of *new* materials was necessary, considering evidence of bodily fluids from other contributors found on a victim or at the scene does nothing to negate the fact that a particular individual's DNA is found *inside* that victim, as was Breitenbach's.

The district court concluded, based on the correct legal standard, that Breitenbach did not have an absolute right to independent testing on mere request but that he must make a specific showing of need. The district court, with all the facts, was unable to find that the request was anything more than a fishing expedition—a conclusion with which Breitenbach agreed. Breitenbach fails to show that the district court abused its discretion by applying an incorrect legal standard.

19

In his reply brief, Breitenbach expands on his argument that he was prejudiced but also states that his defense was never that the crime did not occur but that he was misidentified as the assailant mostly because of the DNA testing. Aside from ignoring all the non-DNA incriminating evidence, this also ignores that the DNA was tested against—and did not match—the DNA of L.A.'s father, a man alluded by Breitenbach to be an alternative suspect.

Breitenbach continues with unsupported arguments that he satisfies every test of prejudice discussed in the briefs largely because he identified "flaws" in the Science Center's testing and because of the "proffer" that the DNA evidence was "simply wrong."

As far as the former, the "flaws" amounted to (1) the testing was "rushed," which the district court determined meant the job was given priority, not that the actual testing was done any faster than normal; (2) the fact that Geering, the State's DNA expert, encountered technical issues, which the district court and Breitenbach agreed had been resolved without issue to the testing; and (3) that the DNA swabs were taken by an experienced OB/GYN instead of by a registered SANE/SART nurse, though the nurse was with the OB/GYN as she took the swabs. Finally, Breitenbach concludes that it is sufficient simply to claim the test results were wrong and that more testing would show DNA from others. This assertion is unsupported and is, in fact, contradicted by Breitenbach at trial when he candidly agreed additional testing would be a fishing expedition.

*The district court did not make mistakes of law or fact or otherwise abuse its discretion.*

Next, Breitenbach argues that the district court abused its discretion by making two factual conclusions that were not supported by the evidence. First, by "treating the

Science Center as an 'independent' laboratory" and second, by indicating "Breitenbach had not set forth what an independent expert was expected to do on his behalf."

With regard to the district court treating the Science Center as an independent or public laboratory, it is clear from the record that the district court was trying to make the distinction between the DNA testing in a civil case, where a laboratory may be hired to make a specific finding, versus the situation here, where the Science Center was not hired specifically to provide evidence that Breitenbach was guilty. Rather, it was merely serving in its role as an independent, public agency to provide identification of the collected DNA and link it to *any* possible suspects.

When Breitenbach requested "independent" testing, he was requesting testing done by a laboratory with no connection to the State. He now argues the district court somehow made the assumption that the Science Center fits that criterion. However, the district court itself acknowledged that the Science Center has a close relationship with the district attorney because it works with the district attorney all the time, but that it is independent in the sense that it could provide exculpatory or inculpatory information and is not biased against any particular defendants.

Breitenbach also argues that the district court relied on an incorrect fact because its written order indicates that Breitenbach had not explained what an independent expert was expected to do in his behalf. Actually, the written order refers to Breitenbach's written motion, indicating the motion did not contain that information, which is accurate. It is obvious the requested expert was to test DNA, and there is no indication the court thought otherwise. Breitenbach fails to demonstrate the district court abused its discretion by relying on incorrect facts.

21

The last avenue for Breitenbach to show an abuse of discretion is to show that the district court's actions were arbitrary, fanciful, or unreasonable, i.e. if no reasonable individual would have taken the view adopted by the trial court. *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). Breitenbach makes many of the same arguments addressed above under the prejudice analysis to argue that the district court's ruling was unreasonable. Specifically, he asserts the testing was rushed, there were technical issues, and the samples were taken by an OB/GYN instead of a SANE/SART nurse. As explained above, the district court reasonably addressed each of those concerns. Breitenbach cannot show that the district court abused its discretion by coming to an unreasonable result.

II. DID THE DISTRICT COURT ERR IN DENYING BREITENBACH'S REQUEST FOR NEW APPOINTED COUNSEL?

Breitenbach next argues that he established justifiable dissatisfaction which required the appointment of new counsel. This was based on his belief that his counsel was not investigating his defenses or requesting DNA testing, his counsel's belief that he was guilty, and a conflict that arose because his counsel wanted to preserve the office's defense budget. Breitenbach contends that denial of his motion was an abuse of discretion that requires reversal of the convictions and remand for new trial with new defense counsel appointed.

*Standard of review*

A district court's refusal to appoint new counsel is reviewed under an abuse of discretion standard, which asks whether any reasonable individual would take the view adopted by the district court. *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006).

22

The defendant bears the burden of establishing an abuse of discretion. *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011).

*Discussion*

While both our state and federal Constitutions guarantee the right of criminal defendants to have the effective assistance of counsel, they do not guarantee the defendant the right to *choose* which attorney will be appointed to represent him or her. *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014).

> "[T]o warrant substitute counsel, a defendant must show 'justifiable dissatisfaction' with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. But ultimately, '"[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel."' [Citations omitted.]" *State v. Sappington*, 285 Kan. 158, 166, 169 P.3d 1096 (2007).

Further, when the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction. *State v. Smith*, 291 Kan. 751, 755, 247 P.3d 676 (2011).

The common theme throughout Breitenbach's complaints on this issue is Smartt's decision to forgo additional DNA testing. He uses that fact to allege that Smartt was failing to investigate defenses, that he was limiting his representation, and even that he

23

had presented a conflict by stating the funds would not be available for Breitenbach's desired testing.

While counsel *does* have a duty to make reasonable investigations, that duty can also be met by making a reasonable decision that particular investigations are unnecessary. A decision not to investigate must be directly assessed for reasonableness in all the circumstances, but a heavy measure of deference is applied to counsel's judgments. *State v. Hedges*, 269 Kan. 895, 914-15, 8 P.3d 1259 (2000).

It is clear from the record that the trial court took great care in considering both of Breitenbach's motions for replacement counsel. Each time, the district court held a hearing to consider Breitenbach's motion for new counsel. At each hearing, the court heard all of Breitenbach's complaints and conducted a thorough assessment of Smartt's conduct and the attorney/client relationship held by Smartt and Breitenbach.

Breitenbach's strongest argument is that the court erred when it depicted Smartt's failure to request additional DNA testing as a tactical decision, which is supported by the fact that Smartt—when given the opportunity—added nothing to the dialogue. Breitenbach argues that Smartt's silence means the district court's determination was not supported by law or evidence and that Smartt did not establish that he was forgoing independent DNA testing as a matter of tactics, strategy, or anything else. Essentially, he asserts the district court could not label Smartt's decision as strategic when Smartt had not established any strategic reason to forgo testing.

Much of Breitenbach's legal authority is drawn from *LaPointe v. State*, 42 Kan. App. 2d 522, 545, 214 P.3d 684 (2009) (holding, in part, that "any determination that defense counsel's actions were a part of his trial strategy would be pure speculation without defense counsel's testimony"). The glaring error here is that *LaPointe* concerns

24

the need to hold an evidentiary hearing to rule on a postsentencing K.S.A. 60-1507 motion. In that context, the *LaPointe* panel was correct. Where there was no evidentiary hearing the record was never developed factually as to the basis for counsel's conduct.

Here, however, we are not considering a K.S.A. 60-1507 motion. More importantly, the district court took great pains to conduct a hearing and establish a foundation on the record by making an assessment of Smartt's actions and Breitenbach's complaints under the circumstances.

The district court took care to listen to Breitenbach's grievances and discuss with him the legal standards under which the court was required to work. After hearing Breitenbach's complaints—again, largely centered on Smartt's refusal to obtain additional DNA testing—the district court found that under the circumstances of the case it could find no compelling reason why the request for additional DNA testing was more than a fishing expedition. It went on to discuss Kansas caselaw that held trial counsel's failure to retest evidence could be a reasonable tactical decision. It even listed a few ways it might be beneficial to a defendant *not* to have additional testing. Finally,

> "[T]he Kansas appellate court said that independently testing of DNA is a tactical decision and failure to do so is not a deficient one.
>
> "And of course every case relies somewhat on the facts, but in this situation I don't see anything that causes me, as this case specifically, to hold anything different. And therefore, I don't think it would be in this Court's purview to direct any testing be done and I do not find as a matter of law that it is a basis for any kind of a determination at this point of some sort of ineffectiveness or a basis for the Court to remove Mr. Smartt either as a irreconcilable conflict."

25

After a discussion of the *LaPointe* case now cited by Breitenbach, the trial court concluded that the disagreement about DNA testing did not establish any justifiable dissatisfaction. While the district court then addressed the conflict issue and the statement that Smartt believed Breitenbach was guilty, it eventually concluded the hearing by reiterating that for many reasons, it had found no irreconcilable conflict, complete breakdown of communication, or any conflict of interest that necessitated removing Smartt as counsel. At the end of the hearing, the court specifically asked, "Anything else for the record, Mr. Smartt, on that issue?" to which Smartt responded, "No, Judge."

Breitenbach is correct that Smartt did not add to the dialogue. And perhaps that would have been helpful. But read in context, Smartt is agreeing to the foundation that the court had already laid. It is clear he did not disagree with the trial court.

Breitenbach also argues in this appeal that he established justifiable dissatisfaction by raising his concern that Smartt's belief in his guilt was limiting his representation. He uses *State v. Smith*, 291 Kan. 751, 247 P.3d 676 (2011), to support this claim. *Smith* centered on a defense attorney's reluctance to admit factual, true information after he viewed a videotape which convinced him of his client's guilt. The *Smith* court ultimately found that if a conflict arises from counsel's refusal to introduce truthful, relevant evidence because they believe their client is guilty, newly appointed counsel can be necessary. *Smith*, 291 Kan. at 758.

This is not the same situation. Whatever his own opinions were, there is no indication that Smartt was withholding evidence out of a belief that Breitenbach was guilty. *Smith* does not stand for the notion that a defense attorney can only represent clients he believes are innocent, but rather that the defense attorney cannot step into the role of fact-finder. As both the State and the district court noted, Smartt was actively

26

engaged in Breitenbach's case and was competently conducting a constitutionally adequate defense.

Breitenbach's last avenue to show the district court erred in denying his request for new counsel is his brief argument that a conflict existed because Smartt was concerned with saving money from the indigent defense budget to the detriment of Breitenbach's case. Citing to the Kansas Rule of Professional Conduct 1.7 (2020 Kan. S. Ct. R. 306), Breitenbach notes that an attorney may not represent a client when there is "substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." Breitenbach argues that because the public defender's office has limited access to funding for experts, it creates a conflict over which clients will get funding.

The district court did not find any weight behind Breitenbach's claims and did not accept them as fact. While Smartt's statements about limited funding may have been inartful, they support the proposition that having a public defender does not entitle Breitenbach to an open checkbook, and additional DNA testing would not, in counsel's judgment, benefit his defense. In any case, this argument fails because we have already determined that the decision to forgo testing was reasonable.

Breitenbach fails to show that the district court erred in denying his request for new counsel.

III. DID THE DISTRICT COURT ERR IN DENYING BREITENBACH'S REQUEST FOR STANDBY COUNSEL?

Similar to the second issue, Breitenbach next argues that the district court abused its discretion by denying Breitenbach's request for standby counsel both because it failed

27

to recognize that appointment of standby counsel was discretionary and because it was unreasonable to deny the motion.

*Standard of review*

The appointment of standby counsel for pro se litigants rests within the sound discretion of the trial court. *State v. Matzke*, 236 Kan. 833, 837, 696 P.2d 396 (1985). As Breitenbach acknowledges, Kansas caselaw provides little guidance for the appointment of standby counsel other than it being a matter of complete discretion. The discretion is so broad that federal authority has even noted that a state may appoint standby counsel over the pro se defendant's objection. *Faretta v. California*, 422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

*Discussion*

Breitenbach argues that the district court abused its discretion because of a statement it made that there was no "basis in law" for it to grant his motion. He argues this shows that the district court did not understand it had complete discretion in the matter. "One way in which a defendant can demonstrate the existence of an abuse of discretion is to show that the district court failed to exercise its discretion, either because it refused to do so or because it failed to discern that it was being called upon to exercise discretion." *State v. Stewart*, 306 Kan. 237, 262, 393 P.3d 1031 (2017).

Breitenbach's argument does not take the district court's full statement into account. The issue is easily resolved when looking at the district court's statements in the record:

"Well, I have a continuing and probably always will for the rest of my career . . . struggled with this issue. We struggle with it in this jurisdiction. Jurisdictions throughout the country struggle with it. Ultimately as the law currently stands *it is the decision within the discretion of the Court. . . Stand-by counsel can be appointed to assist the defendant and/or the Court at the court's discretion.*

"A number of the [arguments for standby counsel] that Mr. Breitenbach has brought up here today are specifically set forth in the warnings that are given when somebody decides to represent themselves as part of what we call the *Lowe* factors. . . .

"I recognize the position it puts an attorney in to be actual standby counsel, which is generally to sit behind somewhere in the courtroom, watch the proceedings, deal with the defendant at the defendant's request or at the request of the Court. It does, frankly, probably makes the Court's job quite a bit easier. And so there are certainly some significantly good arguments for stand-by counsel in felony cases or in all cases. . . . [B]ut there is nothing specific here that compels me to believe that stand-by counsel would be especially beneficial in this situation.

"Again, partly because I think what Mr. Breitenbach is really asking for is co-counsel and there is – I can perceive at some point that appellate courts are going to move on this issue one way or the other, but they haven't. *It is still completely left to the discretion of the trial court* and based upon the arguments that were made by Mr. Breitenbach, the request, the Court's understanding of the law, I do not find there is a basis in law for the Court to grant the motion for stand-by counsel, so I'll deny that motion." (Emphases added.)

When taken in context, it is clear the district court meant there was no "basis in law" which *compelled* it to grant his motion for standby counsel and the court explicitly, repeatedly recognized it had discretion in the matter.

Breitenbach also argues on this issue that the district court abused its discretion by coming to an unreasonable ruling. In Breitenbach's eyes, the district court noted only

29

benefit from the appointment of standby counsel and thus to refuse it when there is no downside is unreasonable. But this ignores the district court's acknowledgment of the awkwardness of standby counsel's position and the uncertainty that courts face with this issue. The court reasoned that Breitenbach was looking more for cocounsel and that standby counsel, in its discretion, would not be especially helpful. Breitenbach fails to show that the district court erred in denying his request for standby counsel.

IV.    DID THE STATE VIOLATE BREITENBACH'S DUE PROCESS RIGHTS BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE OF FINGERPRINT TESTING?

Breitenbach's fourth issue is that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose exculpatory fingerprint testing. Prior to trial, Breitenbach filed a general discovery motion for all forensic evidence in the State's possession. As a result of discovery he received, Breitenbach was aware a fingerprint had been lifted from a patio door at the scene. At trial, during Breitenbach's cross-examination of a Wichita Police Department CSI, it came to light that it was standard practice for collected fingerprints to be submitted for testing right away, which had likely been done for the fingerprint evidence in this case.

The next morning, the State informed the court and Breitenbach that a report had never been generated on the fingerprint exam, but it had requested one and would share that report with Breitenbach once it was available. After speaking to law enforcement about the fingerprint, the State informed the court and Breitenbach that a report was never generated because although the latent print was initially rated of value, it was searched against the Automated Fingerprint Identification System (AFIS) with negative results. Upon the State's request for a report, the lab pulled the record, took a second look at everything, deemed the latent print as "not of value" for identification or elimination

30

purposes, and generated a report to that effect. The State received and delivered the report to Breitenbach during the second day of trial, and Breitenbach questioned Detective Waite that day about the fingerprint and the report. After that, Breitenbach requested nothing further concerning the matter.

Breitenbach argues that this sequence of events constitutes a *Brady* violation requiring a new trial because his due process rights were violated.

*Standard of review*

The district court's determination of a *Brady* violation is a legal question which is reviewed de novo with deference to any factual findings. But the district court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard. A district court abuses its discretion when it applies an incorrect legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact. *State v. Warrior*, 294 Kan. 484, 509, 277 P.3d 1111 (2012).

*Discussion*

"Under *Brady v. Maryland*, prosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

"Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.

"Evidence that is favorable to the accused encompasses both exculpatory and impeachment evidence. For *Brady* purposes, there is no distinction between these two

31

types of evidence that are favorable to the accused; thus, impeachment evidence is considered exculpatory.

"There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

"Under the test for materiality governing all categories of *Brady* violations, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation omitted.]" *State v. Warrior*, 294 Kan. 484, Syl. ¶¶ 7-11, 277 P.3d 1111 (2012).

Breitenbach has addressed the three necessary prongs.

For the first prong, Breitenbach must show that the fingerprint analysis was favorable to him. He makes a brief argument that it is exculpatory because it "indicated he was not the person that entered or exited through that sliding glass door" and thus he could not be the perpetrator of the crime. In the context of a prosecutor's obligation to disclose exculpatory evidence, we have said that evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. And we further acknowledge that evidence may be exculpatory without being exonerating. *State v. Lackey*, 295 Kan. 816, 823, 286 P.3d 859 (2012).

Breitenbach also argues that the evidence was favorable because he could have used it to impeach the State's witnesses. The report indicated that upon receipt of the latent print, it was graded "of value" and two attempts to search AFIS were made with negative results. One attempt checked the database generally, and one was specific to

32

known prints of Breitenbach. The print was reevaluated and deemed not of value for identification or elimination purposes. Breitenbach argues that the switch from "of value" to "not of value" shows that evidence is only "critically examined" or is "disregard[ed]" when it is inconsistent with the State's theory.

It appears the only value to the evidence produced from the fingerprint was the hope that the fingerprint would prove to belong to someone other than Breitenbach. Then it could *possibly* be used by Breitenbach to establish reasonable doubt for the jury. This hope, combined with the missing report, did have some value for Breitenbach. Because we have found some modicum of favorable value to the missing evidence, we find that Breitenbach has satisfied the first prong of *Brady*.

However, even if Breitenbach has met the first prong, he fails on the second prong, which requires the State to have suppressed evidence either willfully or inadvertently. It is undisputed here that the one page report was given to Breitenbach during the second day of the three day trial. But "delayed rather than absent disclosure of exculpatory information may or may not qualify as a *Brady* violation, depending on whether the defendant can establish prejudice due to his or her inability to use the *Brady* material effectively at trial, as well as an appeal at the state or federal appellate court in which the issue arises." *State v. Hirsh*, 310 Kan. 321, 336, 446 P.3d 472 (2019). Breitenbach argues before this court that he was unable to use the evidence, but the record refutes this assertion.

The problem is not that the evidence could not be used. The problem, if any, is that Breitenbach just did not use it. The court even asked Breitenbach if he requested anything further concerning the fingerprint and the report. Breitenbach responded that he did not. Under the second prong, the evidence was not suppressed, it was just late. And

the lateness of the production was explored to the extent Breitenbach wished to explore it.

Regardless, Breitenbach would still need to show prejudice in order to meet the third prong of the *Brady* test. Before he can do that, Breitenbach must at least establish that the fingerprint evidence was material to his case.

> "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . . [The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'[Citations omitted.]" *Hirsh*, 310 Kan. at 337.

We are not convinced this fingerprint evidence would have had any impact on the trial. It does not prove that Breitenbach did not enter the apartment, especially in light of the other evidence placing him there. It simply shows that someone else may have touched the patio door. Despite the delay in Breitenbach obtaining the fingerprint report, it does not undermine our confidence in the outcome of the trial, and it does not establish prejudice amounting to a *Brady* violation. Breitenbach fails to show that the State violated his due process rights under *Brady*.

34

V.    DID CUMULATIVE ERROR DEPRIVE BREITENBACH OF HIS RIGHT TO A FAIR TRIAL?

Having found no errors on appeal, the cumulative error doctrine does not apply. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015).

Affirmed.

BEIER, J., not participating.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,503 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.