No. 123,439

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY D. A. MYERS,
*Appellant*.

SYLLABUS BY THE COURT

1.

When two or more criminal cases are consolidated for trial because all the charges could have been brought in one charging document, then applying the base sentence rules under K.S.A. 2020 Supp. 21-6819(b) separately to the defendant's convictions in each case violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

2.

For K.S.A. 2020 Supp. 21-6819(b) to comply with the Equal Protection Clause of the Fourteenth Amendment, when two or more cases are consolidated for trial because all the charges could have been brought in one charging document, and the defendant is convicted of multiple charges at trial, the defendant shall be sentenced using only one primary crime of conviction and one base sentence, as though all the charges had been brought in one complaint.

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed April 8, 2022. Convictions affirmed, sentences vacated, and case remanded with directions.

*Peter Maharry* of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., ATCHESON and WARNER, JJ.

MALONE, J.:  After a consolidated trial of two criminal cases, a jury convicted Anthony D. A. Myers of attempted first-degree murder, two counts of aggravated battery, two counts of criminal discharge of a firearm, and two counts of criminal possession of a weapon by a convicted felon. The district court sentenced Myers separately in each case, imposing a controlling sentence of 855 months' imprisonment.

Myers appeals, arguing (1) the district court erred in consolidating his two cases for trial; (2) the district court erred in denying his motion for new counsel; (3) he received ineffective assistance of counsel at trial; (4) his convictions for first-degree murder and aggravated battery were multiplicitous, as were his convictions for criminal discharge of a firearm and aggravated battery; (5) cumulative error denied him a fair trial; (6) K.S.A. 2020 Supp. 21-6819(b), as applied, violates his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and (7) the district court erred in calculating his criminal history score because the State failed to provide evidence that his prior misdemeanor convictions were counseled. After thorough review of the record, we affirm Myers' convictions but remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

On February 15, 2017, Dawnisha Johnson rented a 2005 gray Pontiac G6 from Kwik Kars. Johnson knew Myers for four or five years through close acquaintances. Johnson rented the Pontiac for Myers because Myers did not have a license. Johnson continued to extend the rental for Myers, who would give her cash to pay Kwik Kars.

Carla Carter lived at her home in Wichita with her husband, her daughters, and her four grandchildren, including J.W., who was 13, and J.C., who was 16. On February 23, 2017, Carter was standing outside watching two of her grandchildren play basketball when a car came down the street "pretty fast." Carter yelled, "'Slow down. The kids are playing.'" The car then stopped and backed up to the front of Carter's driveway. Carter again told the driver to slow down. The driver then told her, "'Stuff like that will get a person shot up, and [he was] the type . . . who could do this.'" Carter got the tag number from the car and noticed the driver was a black male with dreadlocks. J.C. was standing near Carter when this occurred, and she told Carter after the car drove away that she got a good look at the driver. Carter called 911 to report the incident because she was scared.

Wichita Police Officer Ryan Oliphant was dispatched. Oliphant spoke to Carter who reported that a silver Pontiac G6, with tag number 757FBB, sped down her street so she yelled at the driver to slow down. Carter stated that the driver then told her, "You don't know if I'm the one to come back and shoot the house—or shoot the place up later." Carter described the driver as a black male with shoulder-length dreadlocks.

Oliphant ran the tag and discovered the car was registered to a car rental company called Kwik Kars. He spoke to the company and learned that the car was rented to Johnson. Kwik Kars called Johnson and said the police were interested in the car. After hearing that the police were calling about the car, Johnson contacted Myers to try to get the car back. When Johnson told Myers about the police, Myers told her it was just about some argument he had with some women who yelled at him in the car. Johnson told Myers to get the car back to her before the police found him. Johnson exchanged text messages with Myers about getting the car back, but he never returned it to her.

*February 25, 2017 shooting*

On February 25, 2017, at around 5 a.m., J.W. was asleep in his bed, in the den by the front window of Carter's house. J.W.'s bed was positioned against the wall near the window. Meanwhile, Carter was sitting up in her chair watching the security cameras when she noticed car lights and then saw brake lights. She said this caught her attention because the houses around her were empty. Carter then saw a shadow on her camera that went up the driveway and between two parked cars. Carter started to walk to the door to see what was happening when she heard "pop, pop, pop, pop, pop" and glass breaking. Carter yelled, "'We've been shot'" and she saw the car leaving.

Carter was concerned about her husband and J.W. because they occupied the bedroom or den facing the front of the house. Carter ran to J.W., who was screaming and bleeding from his leg. Carter helped J.W. to the living room and called 911. The bullet had gone all the way through J.W.'s ankle, cracking the bone.

Wichita Police Officer Tyler Richards was dispatched to Carter's home. Richards asked J.W. if he had been in any arguments with anybody who would have targeted him because Richards noticed all the gunshots focused on his room. J.W. told Richards that a few days earlier someone threatened to shoot up the house. After speaking to police, Carter went with J.W. to the hospital.

Wichita Police Department Crime Scene Investigator Karie Railing responded to Carter's house. She photographed the scene, and her photos were admitted at trial. Railing documented damage to the front window. Railing saw three bullet holes on the right pane of the window and saw the center pane was broken. Railing also noticed bullet holes in the siding of the home and the entry door. Based on the bullet holes, the shooter stood in front of the house, shooting into the house. Railing found a bullet on J.W.'s bed that she collected. Railing found other bullet holes in the mattress but was unable to recover any

4

other bullets from the scene. Outside the house, Railing recovered casings. Railing did not find any fingerprints on the casings.

Wichita Police Detective Brian Mock was assigned the case. On February 27, 2017, Mock obtained the Kwik Kars rental form and found Johnson rented the car. Mock talked to the owner of Kwik Kars, Brady Dody, who helped Mock locate the car by activating its GPS locator. The GPS did not allow officers to track the car but pinged its location when requested. Mock directed Wichita Police Officer Jared Henry and his partner, Detective Christopher Hornberger, to locate the Pontiac.

Mock called Johnson, and Johnson informed him that Myers drove the rental car on February 23, 2017, and she did not see it until after 5:30 p.m. Johnson asked why the police were interested in the car, and Johnson said that Myers had told her that he had been in some sort of argument with a lady he did not know. Johnson told Mock that she knew Myers had a gun in the past.

Henry located the car, which was unoccupied, and called an undercover officer to watch the Pontiac. Wichita Police Officer Michael Russell responded in an undercover car. Russell observed a male access the Pontiac from the passenger side and then the driver's side. The male then got into the passenger seat of a white Cadillac driven by a female. Russell observed the Cadillac start to drive away before coming to a stop. The male then exited the Cadillac and walked back to the Pontiac. Russell thought the man was carrying something small in his hands. The man then got into the Pontiac's driver's side for a moment before returning to the Cadillac. The Cadillac then started to leave the area. Russell told Henry and Hornberger to follow the Cadillac. Russell returned to watching the Pontiac.

Henry and Hornberger saw the driver of the Cadillac fail to signal, so they initiated a traffic stop. Henry contacted the driver, later identified as Elizabeth Alverado.

5

Hornberger approached the passenger's side and the passenger identified himself as "Derek Myers." Hornberger thought the passenger was giving him a false name and asked if he had any tattoos because he could visibly see one on the passenger's chest. The tattoo said, "'Loyalty.'"

Hornberger had just confirmed the passenger was Myers, when he saw him open his door and run off. Henry chased Myers through a neighborhood. Hornberger detained Alverado. Henry eventually found Myers hiding in a backyard. Henry searched Myers and found a rental car key and some money. Russell searched the Pontiac and found a .9-millimeter handgun under the driver's seat. Mock had the casings recovered from Carter's house and the gun from the Pontiac submitted for testing.

Mock met with J.C. and Carter on March 2, 2017. Mock did not tell them that anyone had been arrested but showed J.C. a photo array. J.C. identified Myers as the driver who threatened them on February 23, 2017, two days before the shooting. Mock did not get the results back from the casings and gun comparison until May 2018. In the meantime, in April 2018, Myers' name surfaced in another shooting investigation.

*April 11, 2018 shooting*

J.S., a 15-year-old, lived with his father and his sister, C.S., a 17-year-old. J.S. liked to play basketball at the McAdams Park rec center. The rec center had an indoor basketball court, which players had to sign in to use, and surveillance cameras.

In the early morning of April 11, 2018, C.S. and J.S. were at home alone. J.S. was sleeping when he heard banging on the door, so he got up and saw a man through the peephole standing on the porch. J.S. opened the door and recognized the man as someone he had played basketball with at the rec center. J.S. saw the man pull a gun out of his hoodie pocket with his left hand, so J.S. started to shut the door. The man then shot

6

through the front door. J.S. got hit in the left thigh and right foot. The man continued to fire through the door while J.S. tried to get away from the door.

C.S. woke up to banging on the door and the gunshots and then she heard J.S. scream. C.S. went into the living room and saw J.S. standing in a puddle of blood. J.S. told her that he had been shot and showed her his leg and his foot. C.S. called 911. J.S. told C.S. that the guy who shot him was a guy he played basketball with who had dreads.

Wichita Police Officer Cort DePeugh was dispatched to the house around 6:30 a.m. When he arrived, he saw bullet strikes on the doorway and a trail of blood. DePeugh followed the blood trail into a bedroom and found a young male laying on the bed complaining of pain in his leg. DePeugh looked at the male's leg and noticed he was bleeding from his ankle and his upper left leg. The male identified himself as J.S. and told DePeugh he was sleeping when he heard someone banging on the door repeatedly, so he went to answer it. J.S. said that when he opened the door someone stepped off the porch, pulled out a gun, and shot him so he closed the door and ran to the bedroom. J.S. said he recognized the shooter as a guy he played basketball with at the rec center, but he did not know the guy's name. EMS took J.S. to the hospital.

Wichita Police Crime Scene Investigator Lori Scott processed the scene. Scott took pictures of the house and the evidence, which were admitted at trial. Scott collected eight .9-millimeter casings from the front yard of the house. Scott found eight bullet holes going through the front door of the house. Scott also found bullet fragments in the house.

Wichita Police Officer Donielle Watson went to the hospital to talk to J.S. J.S. gave Watson a description of the shooter and stated that the shooter was left-handed. J.S. also told him that he played basketball with the shooter on either March 14 or March 21. Henry took the description and went to the rec center. Henry found J.S.'s signature on the

sign in sheet from March 21 and then watched the surveillance footage from around that time. While watching the footage, Henry recognized Myers from the prior investigation.

Henry relayed the information to the violent crime task force. Watson returned to the hospital to show J.S. a photo array. J.S. identified a photo of the shooter, Myers.

Wichita Police Officer Bryan Knowles and his partner Brock Kampling found Myers and took him into custody. Matthew Balthazor, a detective with the Wichita Violent Crime Unit, completed a personal history form on Myers and had him review and sign the forms. Balthazor observed that Myers signed the forms with his left hand.

*Charges and criminal proceedings*

On May 25, 2018, the State charged Myers with attempted first-degree murder, aggravated battery, criminal discharge of a firearm, and criminal possession of a weapon by a convicted felon under case number 18CR941 for the shooting of J.S. On June 26, 2018, the State then charged Myers with criminal discharge of a firearm, aggravated battery, criminal possession of a weapon by a convicted felon, and possession of cocaine under case number 18CR1664 for the shooting in February 2017 injuring J.W.

On June 29, 2018, Myers requested an attorney and the district court appointed Casey Cotton to represent him. On July 13, 2018, Cotton moved to withdraw after Myers filed an ethics complaint against him. The district court granted Cotton's motion. The district court then appointed Steven Wagle to represent Myers.

On October 22, 2018, Myers filed a pro se motion to remove Wagle. At a hearing on the motion, Wagle asserted that he was physically assaulted by Myers, Myers had called him by a racial slur multiple times, and there was a complete lack of communication between the two. The district court granted the motion, finding counsel

8

had been physically assaulted by Myers and there was a complete breakdown of communication. The district court then appointed Steven Mank to represent Myers.

Mank moved to withdraw as counsel on December 18, 2018. The district court granted the motion and appointed Kenneth Clark.

On April 29, 2019, the State moved to consolidate 18CR941 and 18CR1664 for trial. Myers opposed the consolidation. The district court granted the State's motion to consolidate over Myers' objection, finding the cases were of the same general character.

On July 3, 2019, less than three weeks before the scheduled jury trial, Myers moved to remove Clark as counsel. At the hearing, Myers complained to the district court about his lack of communication with Clark. Clark acknowledged some lack of communication and stated Myers "might be better served with different counsel." The district court denied the motion, finding Myers had failed to show a complete breakdown in communication, an irreconcilable disagreement, or a conflict of interest.

The district court held a four-day jury trial beginning July 22, 2019. The State dismissed count four, possession of cocaine, in 18CR1664 at trial. The State called various law enforcement officers and other witnesses who testified to the above facts. Some testimony relevant to the issues on appeal will be mentioned.

J.C. identified Myers as the person driving the car on February 23, 2017. J.C. testified that she had never seen Myers before the day he threatened them. Forensic Scientist Justin Rankin testified as an expert that the casings recovered from Carter's house were fired from the gun found in the Pontiac. When asked about the more than a year delay in testing the weapon, Rankin explained that he was the only person responsible for every firearm comparison case in Sedgwick County and he had to prioritize testing based on upcoming trial dates. He also explained that because he is the

9

only examiner, he had to get an outside source to verify his results, meaning he would have to submit his cases to another agency to verify his results. J.S. also identified Myers as the person he played basketball with and who shot him. The State rested and Myers moved for a judgment of acquittal, which the district court denied.

Myers testified on his own behalf. Myers testified that he let at least two other people use the Pontiac, including someone named Orlando. Myers testified that he did not argue with Carter on February 23, 2017, and that he never told Johnson that he did. He also claimed he had never seen Carter before. He claimed he did not own a gun and did not put a gun in the Pontiac. Myers testified that he recognized J.S. from playing basketball but he never saw him anywhere else, and he never went to J.S.'s house.

Myers also called D.D., who testified that he was friends with J.S. and often played basketball at the rec center. D.D. stated that a lot of people who played basketball at the rec center had dreads. D.D. testified that he did not recognize Myers. On cross-examination, D.D. maintained he did not tell any police officer he knew the shooter had "'Loyalty'" tattooed on his chest even though the report stated he did. The defense rested.

The State called rebuttal witnesses. The State called K.W., J.S.'s friend, who testified that he and J.S. played basketball with Myers about half of the time they were at the rec center. K.W. testified that sometimes the basketball games would become "testy," but he could not think of any fight or incident that would have led to the shooting. K.W. said he heard the police sirens and went over to J.S.'s house and talked to his sister who described the shooter. K.W. thought the description sounded like someone he and J.S. had played basketball with at the rec center. K.W. told Watson that the shooter sounded like a guy they played basketball with who had a "'Loyalty'" tattoo on his chest. The State also recalled Balthazor, who testified that he could not locate any record for a person named "Orlando Stantin" and that the closest he could find was an "Orlando Stanford," but Stanford was in prison during the time of both crimes.

10

The district court instructed the jury. The jury found Myers guilty of attempted first-degree murder, aggravated battery, criminal discharge of a firearm, and criminal possession of a weapon by a convicted felon in case 18CR941. The jury found Myers guilty of criminal discharge of a firearm, aggravated battery, and criminal possession of a weapon by a convicted felon in 18CR1664.

*Posttrial proceedings*

On August 7, 2019, Myers filed a pro se motion for new trial based on ineffective assistance of counsel. Clark also filed a motion for judgment of acquittal, based on multiplicity. The presentence investigation (PSI) report revealed that Myers had a criminal history score of B. Myers filed a pro se objection to the PSI report.

On October 16, 2019, Myers filed a pro se motion to remove Clark as counsel, alleging he was ineffective. The district court appointed Mark Sevart to represent Myers.

On June 17, 2020, Sevart objected to the PSI report asserting that it incorrectly scored Myers' previous misdemeanors. Sevart also filed a motion for new trial asserting Myers had received ineffective assistance of counsel during his trial.

On July 9, 2020, the district court held a sentencing hearing and heard Myers' motion for new trial. Sevart stated that "as far as the evidence goes" for his motion for new trial, he would ask the court to take judicial notice of the court file. He then presented his arguments on the motion for new trial, including whether Myers received ineffective assistance of counsel. The district court denied the motion.

The district court proceeded to sentencing, where Sevart withdrew his objection to the criminal history. Myers then personally affirmed that he was not objecting to his criminal history score of B. In 18CR941, the district court set the base sentence for

attempted first-degree murder at 618 months' imprisonment. The district court ran the remaining three charges in that case concurrent to the base offense for a controlling sentence of 618 months' imprisonment with 36 months' postrelease supervision. In 18CR1664, the district court set the base sentence for criminal discharge of a firearm at 228 months' imprisonment. The district court ran the criminal possession of a firearm conviction consecutive to the criminal discharge of a firearm conviction and ran the aggravated battery conviction concurrent for a controlling sentence of 237 months' imprisonment with 36 months' postrelease supervision. The district court ordered the sentences in the two cases to run consecutive for a total term of 855 months' imprisonment. Myers timely appealed the district court's judgment.

DID THE DISTRICT COURT ERR BY CONSOLIDATING THE CASES FOR TRIAL?

Myers first claims the district court erred in consolidating his two cases for trial. The district court can order two charging documents charged against a single defendant to be tried together "if the crimes could have been joined in a single complaint, information or indictment." K.S.A. 22-3203. Crimes can be joined in a single charging document when the crimes charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." K.S.A. 22-3202(1).

Myers argued against consolidation before trial, but the district court granted the State's motion to consolidate, finding the two cases of the same general character. The district court found that although some of the charges were different, the two cases occurred at the same time of day and involved individuals Myers had prior contact with. The district court also noted that both cases involved Myers allegedly shooting at homes, using a .9-millimeter firearm, and had a victim identify Myers as the shooter. The district court also rejected Myers' prejudice argument, stating that it believed jurors follow the instructions given and make the State prove every element of every offense.

12

Myers argues that the two cases were not of the same character because the incidents occurred at different locations, involved different people, and occurred over a year apart. Myers argues that the district court's reliance on the fact that both cases involved shooting into an occupied home cannot support consolidation because that fact is "a product of the charge, not of some unique similarity between the two cases." Myers also argues that at trial, the evidence in both cases was separate; the State first called 14 witness to testify to the February 2017 shooting, then called 9 witnesses to testify to the April 2018 shooting, and only one witness—Officer Henry—overlapped both cases. Finally, Myers argues that even if consolidation were legally appropriate, the district court abused its discretion because consolidation prejudiced Myers by bolstering the evidence in each case and leading the jury to believe Myers was a "'general wrongdoer.'"

The State argues that the district court properly granted consolidation. The State argues that the cases need only be similar not identical and that the differences Myers focuses on do not refute the district court's finding. The State asserts that the crimes in each case were similar because the facts supporting the charges were similar. The State argues that the district court did not abuse its discretion in consolidating the cases because the district court properly considered that juries follow instructions and there was no sign that consolidation would prejudice Myers. Finally, the State asserts that any error in consolidating the cases was harmless.

This court uses a three-step analysis when reviewing challenges to a district court's decision to consolidate cases for trial:

> "First, we determine whether K.S.A. 22-3203 permits consolidation. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) sets out the conditions under which multiple crimes may be joined in a single complaint. Whether one of these conditions is satisfied is a fact-specific inquiry, and we review the district court's factual

13

findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo.

"Second, because K.S.A. 22-3202 provides that the district court 'may' order charges joined together, the court retains discretion to deny a consolidation request even if a statutory condition is met. . . . We review this decision for an abuse of discretion.

"Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice—that is, whether the error affected a party's substantial rights. [Citations omitted.]" *State v. Carter*, 311 Kan. 783, 793, 466 P.3d 1180 (2020).

We first determine whether the statutes permit consolidation. The district court allowed consolidation on the statutory ground that the charges in the two cases were of "the same or similar character." K.S.A. 22-3202(1). Here, neither party challenges the district court's factual findings. Instead, Myers argues that the findings did not satisfy the condition that the cases be of the same or similar character. We have unlimited review of the district court's legal conclusion that the statutory test is satisfied. *Carter*, 311 Kan. at 793.

Myers argues that the crimes in the two cases were not of the same or similar character because they occurred over one year apart, they involved different people, and they occurred at different locations. But as the district court noted in its ruling, the Kansas Supreme Court has upheld consolidation even when the crimes occurred after a passage of time, occurred at different locations, and involved different people. For instance, in *State v. Cruz*, 297 Kan. 1048, 307 P.3d 199 (2013), Cruz shot and killed a man in the early morning hours in a nightclub parking lot. Investigation revealed that Cruz had been involved in a murder a year earlier in the early morning in a strip club parking lot. The State charged Cruz in two separate cases and the district court consolidated the two cases against Cruz for trial, finding them to be of the same or similar character. On appeal, the Kansas Supreme Court upheld the consolidation and summarized the facts and similarities of the two crimes:

14

"Both crimes involved patrons leaving a nightclub at closing time; both victims were accosted and challenged in the establishment's parking lot before the patrons could reach their respective vehicles; both victims had scant warning before being shot repeatedly and killed with a handgun; the same weapon was used in both shootings and contained a small amount of DNA that did not exclude Cruz as a contributor; a fellow gang member identified Cruz as the shooter in both incidents; and both cases charged first-degree murder and criminal possession of a firearm. If that scenario does not establish two crimes of the same or similar nature, one would need a novelist's imagination to conjure up one that would." 297 Kan. at 1055.

We observe that there were more similarities in *Cruz* than we have here: the same weapon was used in both shootings and the same fellow gang member identified Cruz as the shooter in both cases. But the State is correct that *Cruz* supports consolidation here and establishes that the mere passage of time does not render two cases dissimilar in character. 297 Kan. at 1057; see also *State v. Crosby*, 312 Kan. 630, 634, 479 P.3d 167 (2021) (finding argument that 1-year time difference prevented crimes from being of similar character unpersuasive and citing cases rejecting similar arguments for time periods of 17 months and 4 years). Thus, Myers' claim that the crimes could not be of similar character because of the one-year period between the two is unpersuasive.

Similarly, Myers' argument that the cases are not similar in character because they involve different people and occurred at different locations is unpersuasive. While the two cases each involved a group of people that did not know the other, the character of the groups was the same: both victims interacted with Myers before the shootings. And again, while the precise address of the crimes was different, the character of the location was the same: the residence of the victim. See *Crosby*, 312 Kan. at 634-35 (finding cases similar despite differing locations and differing people because both crimes involved a drug dealer as the victim and Crosby threatened the victim with a firearm while trying to take drugs without payment).

15

Myers also argues that the motive in each case was not the same because the State did not establish a motive in J.S.'s shooting. But the State at least offered a possible reason for J.S.'s shooting when K.W. testified that the basketball games at the rec center would become "testy." While the State did not establish a definite motive for J.S.'s shooting, it did establish that both cases were similar in that the victims did not know Myers well and he still shot up their houses within a brief time of interacting with them. The seemingly inexplainable overreaction by Myers is another similarity between the two cases, not a fact undermining consolidation.

To best illustrate how different two cases must be to not satisfy the same or similar character test, we look to *State v. Thomas*, 206 Kan. 603, 481 P.2d 964 (1971), where our Supreme Court reversed a district court's decision to consolidate a murder case and an unrelated forgery case. The murder case stemmed from a body found in a car containing Thomas' fingerprint and witness accounts that Thomas and the victim were seen together earlier in the evening at a club. In contrast, the forgery case stemmed from checks and cards stolen from various victims over a few weeks. Our Supreme Court reasoned that the forgery and murder cases were in no way similar, and the district court's decision to consolidate the cases for trial amounted to prejudicial error. 206 Kan. at 608.

There are many more similarities here than existed in *Thomas*. Both cases filed against Myers involved early morning shootings at residences; a .9-millimeter weapon was used in both shootings; Myers had contact with the victims a brief time before the shootings in each case; both shootings involved Myers overreacting to minor incidents with the victims; and the charges filed in each case were identical except that 18CR941 included a count of attempted first-degree murder. The Kansas Legislature has said that a court can consolidate two cases for trial when the charges are of the same or similar character. This is a broad test that is relatively easy to satisfy. We are satisfied that the State could have initially filed all the charges against Myers in a single complaint because

16

the cases were of the same or similar character. Thus, we find the district court did not err in finding that the statutory test for consolidation was met.

Finding a statutory condition for consolidation is met—that the charges in the cases are of the same or similar character—we must next examine whether the district court abused its discretion in ordering consolidation. A district court abuses its discretion if its action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Crosby*, 312 Kan. at 635. Myers bears the burden of showing an abuse of discretion. 312 Kan. at 635.

Myers argues the district court abused its discretion because consolidation prejudiced him in that a jury would be less likely to believe that two individuals who did not know each other were both mistaken in identifying Myers as the shooter. Myers likened this prejudice to admitting prior crimes evidence under K.S.A. 60-455. He asserts that consolidation bolstered the State's evidence in each case, leading the jury to believe that Myers was a "general wrongdoer." The State counters that the district court did not abuse its discretion because it considered the prejudice but found that jurors would follow the instructions. The State asserts that Myers identifies no real prejudice, just speculation.

Myers cannot meet his burden of establishing the district court abused its discretion in consolidating his two cases for trial. First, Kansas appellate courts have consistently rejected the argument that consolidation is equivalent to the prejudicial admission of other-crimes evidence under K.S.A. 60-455. See, e.g., *State v. Smith-Parker*, 301 Kan. 132, 161, 340 P.3d 485 (2014) ("'Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455.'").

Second, the jury was instructed: "Each crime charged against the defendant is [a] separate and distinct offense. You must decide each separately on the evidence and law

17

applicable to it, uninfluenced by your decision as to any other charge." Kansas appellate courts have found this instruction "negates the inherently prejudicial effect of trying a person on multiple counts." *Cruz*, 297 Kan. at 1058. And jurors are presumed to follow the district court's instructions. *State v. Llamas*, 298 Kan. 246, 261, 311 P.3d 399 (2013).

We have little doubt that consolidation of the cases against Myers for trial may have bolstered the State's evidence against him. Almost any defendant can make this complaint when cases are consolidated for trial. But without Myers pointing to something more specific as to how consolidation of the cases for trial prejudiced him in his situation, we are unable to find that no reasonable person would have agreed with the district court's decision to consolidate the cases against Myers for trial. Thus, we conclude the statutory test for consolidation was met, and Myers has failed to meet his burden of showing that the district court abused its discretion in consolidating the cases for trial.

## DID THE DISTRICT COURT ERR IN REFUSING TO APPOINT NEW COUNSEL BEFORE THE START OF TRIAL?

Myers next claims the district court abused its discretion in denying his motion for new counsel before trial. The state and federal Constitutions guarantee criminal defendants a right to effective assistance of counsel, but they do not guarantee the defendant the right to choose which attorney will represent him or her. *State v. Breitenbach*, 313 Kan. 73, 90-91, 483 P.3d 448, *cert. denied* 142 S. Ct. 255 (2021). The rules surrounding a motion for substitute counsel are well established:

>"'[T]o warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. But ultimately, "'[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not

18

deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel.'"

"Further, when the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction. [Citations omitted.]" 313 Kan. at 90-91.

Myers filed a pro se motion to remove Clark as counsel less than three weeks before trial, alleging "a major communication issue," that Clark had stated he is too busy to properly provide counsel to Myers, and that Myers had filed several pro se motions that Clark did not adopt. The district court held a hearing on Myers' pro se motion on July 10, 2019. At the hearing, Myers stated that he and Clark had not had a chance to go over his defense, that he asked Clark to send some subpoenas out for him, and that Clark had not contacted witnesses Myers told him to contact. Myers stated that he needed to be "communicating with [his] counsel, which [wa]s not happening."

The district court inquired of Clark. Clark said:

" . . . I can't disagree with what Mr. Myers is saying about a lack of communication frankly. My workload right now has been a struggle for me, and I have not had as much time as I would like to have communicated with him about this case. I did meet with him recently.

"And just to address comments that he made, I do have an investigator who is in the process of trying to contact the witnesses he gave me. And I had talked briefly with his sister just to let these folks know that someone would be contacting them.

"Judge, I think that, unfortunately, the circumstances have been such that we've—Mr. Myers and I have kind of come to a situation where we're not able to communicate; and when we do communicate, it's not as effectively as we should, to be able to work together to prepare a defense in this case. He is facing significant charges. The cases, as the Court noted, have now been consolidated. But I'm concerned about my ability going forward to effectively represent him. And frankly, I think he might be better served with different counsel."

19

The district court asked Clark if he had met with Myers and whether Myers had told him what he wants done on the case, to which Clark responded, "We have had meetings to that effect, yes, Your Honor." The district court pointed out that Myers has had several lawyers appointed and that if a new attorney was appointed it was unlikely that trial would occur as scheduled. The district court then asked Myers what he thought a new attorney could do that Clark did not, with the explanation that lawyers need not file a motion that is frivolous. Myers responded, "Well, communication [wa]s key," and that he could not establish his defense if he could not speak with an attorney.

The State then argued that Myers' motion seemed to follow a pattern where he waited until close to the jury trial date then moved to get new counsel appointed. Myers responded to the State's assertion, conceding that he has been through many attorneys, but asserted if he called his attorney and the attorney did not return his call or come talk to him, there was nothing he could do to communicate with them.

The district court responded that lawyers can prepare a case without necessarily contacting the defendant regularly and that there were 12 days until trial in which he and Clark could discuss strategy. The district court reiterated that he heard Clark state he had a lot of work to do, but the court stated every attorney has a lot of work and the test was whether there was a conflict of interest or breakdown in communication. The district court found no conflict of interest was alleged. The district court then addressed whether Myers showed an irreconcilable disagreement or complete breakdown in communication. The district court found that a lawyer need not visit a defendant a certain number of times and although Clark stated he felt Myers may be better off with another attorney, that statement did not rise to the level of justifiable dissatisfaction. The district judge also stated that Myers' request for new counsel seemed to be a pattern for him:

> "This is a pattern, and I'm taking that into account. This is a pattern of Mr.
> Myers. [The prosecutor] laid out how many attorneys there have been; some very good

20

attorneys that Mr. Myers has had, or found complaints about. And I'm considering and thinking about the easy thing for me to do is to appoint another lawyer.

"But a decision has to be made upon whether or not, like I have stated, whether there is a conflict of interest, which there is none that I have been told about. An irreconcilable disagreement—there is disagreement. Nobody has told me that it's irreconcilable; nobody has told me that these witnesses won't be subpoenaed; nobody has told me that motions won't necessarily be filed. And I haven't heard about a complete breakdown in communication."

On appeal, Myers argues that he established a breakdown in communication and that counsel had a conflict of interest because counsel did not have time to prepare adequately. The State counters that the district court did not abuse its discretion in finding no breakdown of communication and Myers' previous actions showed a pattern of creating conflicts to obtain new counsel.

This court reviews a district court's decision on whether to substitute counsel for an abuse of discretion. *State v. Pfannenstiel*, 302 Kan. 747, 762, 357 P.3d 877 (2015). A district court abuses its discretion if its action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Crosby*, 312 Kan. at 635. Myers bears the burden of establishing an abuse of discretion. 312 Kan. at 635.

Myers briefly argues that he established a conflict of interest for Clark to continue to represent him. But Myers did not argue there was a conflict of interest before the district court. The district court even noted as much stating it had not been told of any conflict of interest. An issue not raised before the district court cannot be raised on appeal. *State v. Gonzalez*, 311 Kan. 281, 295, 460 P.3d 348 (2020).

Myers mainly argues on appeal that the facts showed a complete breakdown of communication and that the district court committed an error of fact by finding there was no breakdown of communication. Myers points to his assertions to the district court that

21

he had only met with Clark to discuss the motion to consolidate and there had been no discussion about trial or his defense. Myers also points to his assertion that he repeatedly tried to call Clark, but they had not talked at all. Myers also asserts that Clark agreed with Myers, by telling the district court that because of his workload he had not spent as much time as was necessary on Myers' case.

The State counters that the record does not establish a complete breakdown of communication. The State asserts that the hearing established that Clark had met with Myers and that Myers had said what he wanted done in the case. The State also points out that Clark admitted that the two do communicate, with the caveat that they may not communicate as effectively as they should. The State also points out that there was no other evidence to support a complete breakdown of communication.

Myers fails to acknowledge that after he raised his concerns to the district court about a lack of communication with Clark, the court conducted further inquiry, explaining that there was still time before trial for Clark to discuss a defense with Myers, that Clark stated he was investigating the witnesses Myers identified, and that simply because Clark had not spoken to him as much as Myers would desire did not mean Clark was not working on the case. The district court did not disregard Myers' assertions but merely considered them along with the other information presented and found that Myers' complaints did not rise to the level of a complete breakdown of communication.

The district court's finding that Myers did not establish a justifiable dissatisfaction supporting new counsel based on a lack of communication is supported by the record. Myers' main complaint he kept reiterating at the hearing was that he could not get a hold of Clark when he called his office, and he felt Clark had not visited him enough to discuss the case. But disagreements or a lack of communication between a defendant and counsel will not always rise to the level of justifiable dissatisfaction. *State v. Brown*, 305 Kan. 413, 425, 382 P.3d 852 (2016). "'The focus of the justifiable dissatisfaction inquiry

22

is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.'" *State v. Staten*, 304 Kan. 957, 972, 377 P.3d 427 (2016).

As the district court pointed out, just because counsel is not visiting with the defendant does not mean that counsel is not working on the case. Clark acknowledged that he had an investigator working on the leads Myers gave him, and Myers himself acknowledged that Clark had recently seen him to go over the motion to consolidate. And as the district court pointed out, there was still time for Clark to talk to Myers about the strategy he planned to present at trial, including the defense. See *Edgar v. State*, 294 Kan. 828, 839, 283 P.3d 152 (2012) (acknowledging that counsel has a duty to consult with defendant's questions of overarching defense strategy); *State v. Rivera*, 277 Kan. 109, 117, 83 P.3d 169 (2004) ("Strategical and tactical decisions like preparation, scheduling, and the type of defense, however, lie with the defense counsel . . . .").

Myers could not provide a specific answer about what new counsel could do for him beyond what Clark had been doing, stating merely that "communication was key" and that he had to communicate with his attorney. But this vague assertion identifies nothing that the appointment of new counsel would address. See *Breitenbach*, 313 Kan. at 90-91 ("[W]hen the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction.").

Myers also argues that the district court's finding that he was trying to delay trial by requesting new counsel was contrary to the facts. But Myers reads too much into the district court's statement. Although the district court did acknowledge a pattern of substituting counsel, the court noted that it needed to determine whether there was an irreconcilable disagreement or a complete breakdown in communication. The district court did not explicitly state it found that Myers was trying to delay the trial by moving

for new counsel. In any event, the district court's consideration of the potential delay of appointing new counsel was not necessarily inappropriate. See *Pfannenstiel*, 302 Kan. at 764 (noting federal courts addressing potential conflict of interest have routinely included timeliness or potential delay as one of the factors considered when determining whether a trial court abused its discretion in denying a motion for new counsel).

The district court never directly asked Clark if he would be prepared to represent Myers at the upcoming trial. But the district court indirectly gathered information relevant to this inquiry when Clark explained that he had been meeting with Myers about what Myers wanted him to do on the case and that an investigator was trying to contact witnesses. We observe that Clark did not file any motion requesting a trial continuance because he was not ready to proceed. Perhaps more significantly, we also observe that after the trial, the district court found that Clark's representation of Myers at trial was not ineffective based on any of the grounds Myers asserted in his motion for new trial.

In sum, Myers did not establish a complete breakdown in communication with Clark to warrant the appointment of new counsel on the eve of the trial. The fact that Myers was asking the district court for a fifth court-appointed attorney was a factor for the court to consider in deciding whether Myers showed justifiable dissatisfaction. The district court asked about Myers' concerns about his communication with Clark, and the court's finding that Myers failed to show a complete breakdown in communication is supported by the record. The district court is justified in refusing to appoint new counsel "'[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense.'" *Breitenbach*, 313 Kan. at 90. The district court made that call here and Myers has failed to show the decision was an abuse of discretion.

24

Myers next claims the district court erred in denying his motion for new trial based on ineffective assistance of counsel. The State asserts that the district court correctly denied Myers' motion for new trial.

On August 7, 2019, Myers filed a pro se motion for new trial on the grounds of ineffective assistance of counsel. Myers asserted that Clark:  failed to investigate his case, failed to produce photographs "that were cru[c]ial for defendant's rebuttal evidence," failed to submit video surveillance from the rec center to rebut preliminary hearing evidence that Myers was the only person who wore his hair in dreadlocks, failed to communicate with Myers, failed to object to any of the State's evidence or testimony, failed to contact alibi witnesses provided by Myers, failed to cross-examine the State's expert witness on firearms, failed to raise at trial that Myers was never subjected to gunshot residue testing, and failed to object to prosecutorial misconduct.

Clark also moved for a new trial on Myers' behalf, arguing that there was insufficient evidence to support the verdicts and that his jury trial rights were violated because the jury was all white while Myers is African American. Myers' new counsel, Sevart, later moved for a new trial alleging that Myers received ineffective assistance of counsel based on a conflict of interest between him and Clark, Clark's lack of preparation, Clark's failure to call witnesses to testify to Myers' lack of gold tipped hair, and Clark's failure to call alibi witnesses.

The district court addressed these motions at sentencing. Sevart argued the motions and stated that "as far as the evidence goes" on the motions for new trial, he would ask the court to take judicial notice of the court file. Sevart did not ask to call any witnesses to support the motions. After hearing arguments, including whether Myers

25

received ineffective assistance of counsel, the district court denied the motions for new trial, finding Myers failed to establish either prong of the ineffective assistance of counsel test. The district court noted that it had observed the trial and saw Clark cross-examine witnesses, that he showed an understanding of the case, and found that nothing in the record suggested that Clark's performance fell below an objective standard of reasonableness. The district court also noted that there was no information before the court about Clark's thought process in relation to the alibi defense.

On appeal, Myers asserts that his convictions should be reversed because Clark was deficient in several areas, "which cumulatively had a direct impact on the verdict rendered by the jury." The State responds that Myers failed to show in district court that Clark provided ineffective representation. Both parties agree that in a motion for new trial based on ineffective assistance of trial, we generally must review the district court's findings of fact for substantial competent evidence and review its conclusions of law de novo. See *State v. Coones*, 301 Kan. 64, 69-70, 339 P.3d 375 (2014).

The Sixth Amendment to the United States Constitution, as applied to the states under the Fourteenth Amendment, guarantees that in criminal prosecutions the accused has the right to effective assistance of counsel. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). An ineffective assistance of counsel claim based on deficient performance is subject to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

> """The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

"'"[Under the second prong of the test for ineffective assistance of counsel], the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citations omitted.]"'" *State v. Butler*, 307 Kan. 831, 852-53, 416 P.3d 116 (2018).

Appellate courts generally will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). Myers' ineffective assistance of counsel claims were raised and ruled on in district court. But as we will discuss, our review of some of Myers' claims is hampered by the lack of an adequate evidentiary record in the district court. Myers' claims on appeal of ineffective assistance of trial counsel fall generally into five categories. Some of the claims Myers raised in district court are not argued on appeal. An issue not briefed is deemed waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

*(1) Clark failed to admit evidence that would undermine J.S.'s and J.C.'s identification.*

First, Myers asserts Clark erred in not procuring the surveillance video from the rec center because it would have showed multiple individuals playing basketball with dreadlocks which would have undermined J.S.'s identification. Myers asserts that Clark also erred in not producing multiple photographs of Myers before and after the alleged shootings to show that he never had blonde hair, which would undermine J.C.'s identification. Myers asserts Clark also called no witnesses to testify that Myers never had blonde hair or gold tips.

27

But Myers cannot prevail on these claims. While Clark may not have admitted surveillance video, he still elicited this information when questioning D.D.:

> "[CLARK:] In your experience with playing basketball up there, were there typically guys there who were playing basketball that wore their hair in dreads?
> "A. Yes.
> "Q. Was that a fairly frequent occurrence?
> "A. I mean, it's like a lot of people come up there with dreads, dreaded hair, like people with different hairstyles."

And Clark did admit a photo of Myers, taken February 3, 2017, that showed he had no color in his hair. Myers himself testified that he had never dyed his hair. Johnson also testified that she did not remember Myers' hair being blonde or gold in color at the time of the 2017 shooting. Thus, Myers has not established that Clark was deficient on this point.

*(2) Clark failed to challenge J.S.'s photo array identification.*

Myers asserts that Clark should have highlighted or followed up on J.S.'s answer of "yes" to the prosecutor's question about whether the detective who showed him the photo array suggested who he should pick out. Myers asserts that Clark also never sought to suppress the suggestive photo array.

Myers fails to recognize that the entire exchange and other evidence in the record established that detectives did not tell J.S. who to choose. The relevant exchange between the J.S. and the prosecutor stated:

> "Q. All right. You said, you didn't know his name, but you recognized his face as soon as you saw him?
> "A. Yes.

28

"Q. When the officer came, did he show you some photos?

"A. Yes.

"Q. Did he indicate anybody's name, or anything at that point, or just showed you the photos?

"A. He just showed me the photos.

"Q. *Did he indicate who you should pick out or anything?*

"A. *Yeah. Yes, he did.*

"Q. *Say that again.*

"A. *Yes, he did. Yes.*

"Q. I guess my question is, did he show you the photos and let you look at them yourself—

"A. Yes.

"Q. —so you could see if you could pick somebody out?

"A. Yes." (Emphasis added.)

Both before and after the complained of statement, the prosecutor reiterated that the detectives simply gave J.S. the photos and let him look at them. And Watson testified that he did not know who was in the photo array because department policy required another detective prepare it. Watson also testified that he never told J.S. who to pick out and he read J.S. an admonition that stated that the suspect may not even be in the photos. Myers has not established that the photo array was tainted requiring action from Clark.

*(3) Clark failed to call witnesses to present an alibi defense.*

Myers argues that he gave Clark "multiple names of alibi witnesses" and that Clark was deficient for only contacting one and deciding not to pursue an alibi defense. He argues Clark's actions constituted a failure to conduct a reasonable investigation.

Clark filed an alibi notice for the April 11, 2018 shooting. The notice listed two witnesses, "exact address unknown." The notice stated that Myers was at the residence shared by the two witnesses at the time of the shooting but did not otherwise specify the

29

substance of the testimony of the two witnesses. The record does not reflect why the witnesses were not called to testify at trial.

Our review of the merits of this claim is hampered by the lack of an adequate evidentiary record in the district court. Myers did not testify at the hearing on his motion for new trial to elaborate on his claim that Clark was ineffective for not calling the alibi witnesses. Myers also did not call either witness to develop what his alibi defense would have been at trial and to establish that the alibi witnesses were, in fact, willing and able to testify at trial. Most importantly, Myers did not call Clark as a witness in district court to establish whether Clark's failure to call the witnesses resulted from a strategic decision made by Clark after investigating the witnesses.

Generally, the decision whether to call a witness at trial is a strategic decision left to counsel's discretion. *Sola-Morales*, 300 Kan. at 887. Strategic choices made by counsel after a thorough investigation of the law and the facts are virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). To prove a claim of ineffective assistance of counsel, the defendant bears the burden of demonstrating that trial counsel's alleged deficiencies were *not* the result of trial strategy. *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004). There is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance. *Butler*, 307 Kan. at 853.

Myers could have called Clark as a witness to support his motion for new trial but did not do so. Without Clark's testimony to explain why he did not pursue the alibi defense and to establish the decision did not result from reasonable trial strategy, Myers fails to overcome the strong presumption that Clark provided reasonable professional assistance. We give full play to that presumption precisely because Myers had the chance to call Clark as a witness but did not do so. Based on the record before us, Myers fails to show that Clark's performance was deficient on the failure to present an alibi defense.

*(4) Clark failed to challenge the State's lack of physical evidence.*

Myers argues that Clark failed to properly challenge the State's lack of evidence about fingerprints and the State's failure to subject Myers to gunshot residue testing. Myers concedes that the State's witnesses testified that fingerprints were not obtained from the casings, but he asserts that Clark "ignored" the lack of evidence.

This argument is confusing because during closing Clark used the witnesses' testimony that they recovered no fingerprints to argue that there was no evidence directly linking Myers to the shootings. Thus, it is unclear how Myers wanted Clark to further "challenge" the witnesses' testimony that there were no fingerprints found in the case. Myers failed to show that Clark's performance was deficient on this point.

*(5) Clark failed to object to the makeup of the jury pool.*

Myers argues that Clark failed to object to the jury pool which had only one African American member. Myers argues that because Clark failed to object, the district court refused to consider his jury pool argument in his motion for new trial.

While Clark and Sevart both asserted the jury pool issue in their motions for new trial, neither raised the claim as an ineffective assistance of counsel issue. Instead, it was raised as a separate constitutional basis for a new trial. Thus, Myers is raising this ineffective assistance of counsel claim for the first time on appeal, although he does not acknowledge it. Generally, an appellate court does not review issues raised for the first time on appeal. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

In any event, Myers' argument fails because he incorrectly asserts that the district court failed to consider his argument because Clark failed to object. The district court pointed out that this issue should have been raised when the jury was selected. But the

31

district court then addressed the merits of the argument, stating the general rules and finding no evidence that jury members had been purposely and systemically excluded from jury service. The district court then denied the motion for new trial based on the makeup of the jury panel. Thus, Clark's failure to object did not bar Myers' motion for new trial based on the makeup of the jury panel.

In sum, Myers fails to establish that Clark's performance was deficient on each of the claims he argues on appeal. Without a showing by Myers that Clark's performance was deficient, we need not reach the prejudice prong of the ineffective assistance of counsel claim. Myers fails to show the district court erred in denying his motion for new trial based on ineffective assistance of counsel.

### WERE MYERS' CONVICTIONS MULTIPLICITOUS?

Myers next argues that his convictions of aggravated battery and attempted first-degree murder in 18CR941 were multiplicitous and that his convictions of aggravated battery and criminal discharge of a firearm in 18CR1664 were multiplicitous. The State argues that none of the convictions were multiplicitous under the proper test.

Myers raised the multiplicity issue in case 18CR941 below but did not raise the issue for the charges in 18CR1664. Generally, this court does not hear issues raised for the first time on appeal. *Gonzalez*, 311 Kan. at 295. But Myers correctly asserts that the Kansas Supreme Court has heard a multiplicity issue for the first time on appeal to prevent the denial of fundamental rights. 311 Kan. at 295. Thus, we will address Myers' claim. This court applies unlimited review to multiplicity challenges. 311 Kan. at 295.

"The Double Jeopardy Clause prevents a defendant from being punished more than once for the same crime." 311 Kan. at 296. Multiplicity occurs when a single offense is charged as several offenses in a charging document. Multiplicity involves a two-part

test, determining first whether the convictions arise from the same conduct, and second whether by statutory definition there is only one offense. 311 Kan. at 296. Under the first prong, the court determines if "the conduct is discrete," meaning the convictions do not arise from the same conduct. 311 Kan. at 296. But if the convictions arise from the same act or transaction then the conduct is unitary, and the court must consider the second prong. Under the second prong, if the convictions are for violating different statutes, the court applies "the same-elements" test:  determining "'whether each offense contains an element not contained in the other; if not, they are the 'same offen[s]e' and double jeopardy bars additional punishment and successive prosecution.'" 311 Kan. at 296.

Neither party contests that the first prong of the multiplicity test is met in either case:  both challenged convictions arise from the same transaction. Thus, Myers' challenges hinge on the second prong:  whether the offenses each contain an element the other does not.

*Myers' convictions of aggravated battery and attempted first-degree murder in 18CR941 are not multiplicitous.*

In 18CR941, the State charged Myers with attempted first-degree murder. An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2020 Supp. 21-5301(a). First-degree murder is defined as "the killing of a human being committed:  (1) [i]ntentionally, and with premeditation." K.S.A. 2020 Supp. 21-5402(a)(1). Thus, the State had to prove that Myers performed an overt act toward the perpetration of first-degree murder, that he intended to commit first-degree murder, and that he failed to complete the crime of first-degree murder. The State also charged Myers with aggravated battery in that case, which is "[k]nowingly causing great bodily harm to another person or disfigurement of another person." K.S.A. 2020 Supp. 21-5413(b)(1)(A).

33

Myers concedes that "[a]t first blush" the two crimes have different elements, but he argues that the linchpin of this analysis depends on the overt act for the attempted murder charge. Myers asserts that because the overt act for the attempted murder was the aggravated battery—Myers shooting J.S. in the leg and continuing to fire—the aggravated battery elements were identical to some of the elements of attempted first-degree murder and thus the two convictions were multiplicitous. Myers cites *State v. Appleby*, 289 Kan. 1017, 221 P.3d 525 (2009), in support of his argument.

But *Appleby* is distinguishable. There, the defendant was convicted of capital murder under K.S.A. 21-3439(a)(4) defined as the intentional and premeditated killing of the victim in the commission of attempted rape. Our Supreme Court addressed whether the defendant's capital murder conviction and the defendant's attempted rape conviction were multiplicitous. 289 Kan. at 1025-26. The court reasoned:

> "To prove the elements of capital murder, the State had to prove beyond a reasonable doubt that Appleby intentionally, and with premeditation, killed A.K. in the commission of, or subsequent to, the crime of attempted rape. Hence, all of the elements of attempted rape were identical to *some* of the elements of the capital murder, meaning the attempted rape was a lesser included offense." 289 Kan. at 1029-30.

In *Appleby*, the capital murder conviction was statutorily based on killing the victim during the commission of attempted rape. Here, the attempted first-degree murder charge is not statutorily based the commission of aggravated battery. This distinction renders *Appleby* unhelpful to the issue at hand.

The State asserts that under the "same-elements" test, Myers' convictions of attempted first-degree murder and aggravated battery each contain a distinct element the other does not. Attempted first-degree murder requires an intent to commit first-degree murder—or an intent to kill a human being—which aggravated battery does not. See *Gonzalez*, 311 Kan. at 297 ("When the crime at issue is an attempt, the mental culpability

34

required is intent to commit that crime."). Similarly, aggravated battery contains an element—the infliction of great bodily harm—which attempted first-degree murder does not. Thus, the two convictions were not multiplicitous under the "same-elements" test.

As Myers acknowledges, this court addressed a similar multiplicity argument in *State v. Walker*, No. 122,222, 2021 WL 2603087 (Kan. App. 2021) (unpublished opinion), *rev. denied* 314 Kan. 859 (2021). The panel addressed whether attempted second-degree murder and aggravated battery were multiplicitous. 2021 WL 2603087, at *6. The panel compared the elements of the two offenses, concluding that:

> "By following the [*State v.*] *Schoonover*[, 281 Kan. 453, 133 P.3d 48 (2006),] elements test, we see the statutes for attempted second-degree murder and aggravated battery define different crimes because each offense contains a distinct element. Attempted intentional second-degree murder requires an intent to kill, while aggravated battery does not. Aggravated battery requires a knowing infliction of great bodily harm, which attempted murder does not—after all, a person could be guilty of attempted second-degree murder for shooting at a person and missing." 2021 WL 2603087, at *8.

Myers asserts that the *Walker* panel's reasoning is erroneous because it failed to consider "what the State had to prove to establish the overt act" and it "only looked at the generic elements of aggravated battery and attempted second-degree murder." But as the State asserts, the "same-elements" test only requires the court to determine "'whether each offense contains an element not contained in the other.'" *Gonzalez*, 311 Kan. at 296. Our Supreme Court has clarified, "[T]he same-elements test . . . '"has nothing to do with the evidence presented at trial."'" 311 Kan. at 298. Thus, Myers' argument that this court must consider what the State had to prove at trial is contrary to the law.

Finally, Myers argues that aggravated battery is a lesser included offense of attempted first-degree murder under K.S.A. 2020 Supp. 21-5109(b)(2) and thus he cannot be convicted of both. But this argument is different from a multiplicity argument and

35

Myers does not assert whether this argument is preserved. In any event, assuming it is properly before this court, his argument also fails.

The lesser included offense statute states:  "Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." K.S.A. 2020 Supp. 21-5109(b). The statute then defines a lesser included crime as "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2020 Supp. 21-5109(b)(2). The lesser included offense statute, like the multiplicity analysis, requires the elements of the two convictions to be examined to determine whether they contain identical elements. As analyzed above, both offenses contain a distinct element the other does not. See *State v. Gaither*, 283 Kan. 671, Syl. ¶ 12, 156 P.3d 602 (2007) ("aggravated battery does not qualify as a lesser-included crime of attempted first-degree murder"). In sum, Myers' convictions of aggravated battery and attempted first-degree murder are not multiplicitous.

*Myers' convictions of aggravated battery and criminal discharge of a firearm in 18CR1664 are not multiplicitous.*

In 18CR1664, the State charged Myers with criminal discharge of a firearm, which is the "[r]eckless and unauthorized discharge of any firearm:  (A) At a dwelling, building or structure in which there is a human being whether the person discharging the firearm knows or has reason to know that there is a human being present" and the "criminal discharge results in great bodily harm to a person." K.S.A. 2020 Supp. 21-6308(a)(1)(A) and (b)(1)(B). In that case the State also charged Myers with aggravated battery, which is "[k]nowingly causing great bodily harm to another person or disfigurement of another person." K.S.A. 2020 Supp. 21-5413(b)(1)(A). Myers again concedes that criminal discharge of a firearm has "some additional elements," but argues that the two crimes are identical in that both require the State to prove great bodily harm. The State counters that the offenses each contain a distinct element.

36

The State's analysis is persuasive. Under the same elements test, criminal discharge of a firearm has distinct elements that aggravated battery does not, including reckless discharge of a firearm, at an occupied building, and the criminal discharge resulted in great bodily harm. Similarly, aggravated battery contains a distinct element that criminal discharge of a firearm does not: knowingly causing great bodily harm. While Myers is correct that the State had to establish that he caused bodily harm for both offenses, he fails to recognize that for criminal discharge of a firearm the bodily harm is merely a result of his reckless discharge of the firearm. Whereas for aggravated battery, the defendant's causing the great bodily harm is the actus reus: the defendant must *knowingly* cause great bodily harm. Thus, each offense contains a distinct element the other does not, meaning the two convictions are not multiplicitous.

Myers also again argues that aggravated battery is a lesser included offense of criminal discharge of a firearm under K.S.A. 2020 Supp. 21-5109(b)(2). But because aggravated battery contains an element that criminal discharge of a firearm does not, it is not a lesser included offense of criminal discharge of a firearm. In sum, Myers' convictions of aggravated battery and criminal discharge of a firearm are not multiplicitous.

DID CUMULATIVE ERROR DEPRIVE MYERS OF A FAIR TRIAL?

Myers argues that cumulative error denied him a fair trial. A cumulative error analysis aggregates all errors and determines whether the combined effect of the errors violated the defendant's right to a fair trial. *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011). But the cumulative error analysis does not apply when multiple errors have not been found. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). Myers did not establish any errors. As a result, a cumulative error analysis does not apply.

37

DOES K.S.A. 2020 SUPP. 21-6819(b), AS APPLIED, VIOLATE MYERS' RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION?

Under the revised Kansas Sentencing Guidelines Act (KSGA), when a defendant is convicted in a "multiple conviction case," the district court may impose concurrent or consecutive sentences subject to certain rules. K.S.A. 2020 Supp. 21-6819(b). In determining the sentence in a multiple conviction case, the district court must establish a "base sentence" for the primary crime—which is the crime with the highest severity level. K.S.A. 2020 Supp. 21-6819(b)(2). The base sentence is then calculated by applying the defendant's full criminal history to the primary crime. K.S.A. 2020 Supp. 21-6819(b)(3). The rest of the defendant's sentences for convictions in the multiple conviction case are calculated using a criminal history score of I. K.S.A. 2020 Supp. 21-6819(b)(5). "The total prison sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence." K.S.A. 2020 Supp. 21-6819(b)(4).

Although Myers' two cases were consolidated for trial, the district court sentenced him separately in each case. In 18CR941, the base sentence for attempted murder in the first degree was 618 months' imprisonment. The district court ran the remaining three charges in that case concurrent to the base offense for a controlling sentence of 618 months' imprisonment with 36 months' postrelease supervision. In 18CR1664, the base sentence for criminal discharge of a firearm was 228 months' imprisonment. The district court ran count three, criminal possession of a weapon by a convicted felon, consecutive to the criminal discharge of a firearm and ran count two, aggravated battery, concurrent for a controlling sentence in 18CR1664 of 237 months' imprisonment with 36 months' postrelease supervision. The district court ordered 18CR1664 to run consecutive to 18CR941, for a total term of 855 months' imprisonment.

38

Myers argues that K.S.A. 2020 Supp. 21-6819(b)—which directs the district court to designate a base sentence for the primary crime in a multiple conviction case and apply an offender's full criminal history to the base sentence—as applied, violated his equal protection rights. He asserts that allowing the district court to apply a base sentence for each case treats one class of defendants—those that have multiple convictions after one trial based on charges raised in a single charging document—differently from another class of defendants—those that have multiple cases consolidated for one trial because the charges could have been brought in one charging document—even though the only difference between the two classes is the number of case numbers attached to the charges.

A statute's constitutionality is a question of law subject to unlimited review. *Gonzalez*, 307 Kan. at 579. Generally, appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. 307 Kan. at 579. Likewise, courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's intent. 307 Kan. at 579. But when a statute implicates "'fundamental interests,'" the presumption of constitutionality does not apply. *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1132, 442 P.3d 509 (2019).

*Preservation*

Myers concedes that he raises this issue for the first time on appeal. Generally, this court will not hear an issue raised for the first time on appeal, even a constitutional one. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). There are three exceptions, including when the "theory involves only a question of law arising on proved or admitted facts and is determinative of the case" or when "consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights." 299 Kan. at 493. Myers argues that this issue can be raised under these two exceptions.

39

The State argues that this case is not a pure legal question because this issue requires determining whether Myers is similarly situated to "other offenders whose crimes were all charged in a single complaint" which the State claims is "inherently factual." The State also argues that the issue does not fall under the second exception because Myers cannot meet his burden of establishing an equal protection violation.

The State's arguments are not persuasive. Contrary to the State's assertion, this court need not consider the facts of Myers' case compared to the facts of other hypothetical cases in addressing an equal protection claim. The similarly situated inquiry only involves comparing Myers' sentencing limitations to those that would have applied had he been charged in one charging document; it does not require comparison to other specific cases. While the State is correct that determining whether consolidation of charges for trial is warranted is a factual inquiry, that question is not the issue here.

Instead, this court looks only to the classes as defined by Myers and determines whether the law as applied to those classes violates equal protection. See *State v. Denney*, 278 Kan. 643, 650-51, 101 P.3d 1257 (2004) (addressing whether the classes presented by the appellant were indistinguishable even though the issue was raised for the first time on appeal, finding it presented a question of law on proven or admitted facts); see also *State v. Dixon*, 60 Kan. App. 2d 100, 131-32, 492 P.3d 455 (finding equal protection challenge to "double rule" properly before the court for the first time on appeal because the court need only consider whether the statute created two classes and if the classes were similarly situated, a question of law requiring no factual findings), *rev. denied* 314 Kan. 856 (2021). There is no question of fact that this court needs to decide in addressing Myers' claim. As a result, this challenge can be heard under the first exception. We also agree with Myers that consideration of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights.

*Analysis*

The Equal Protection Clause of the Fourteenth Amendment states: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under the Equal Protection Clause "similarly situated individuals should be treated alike." *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007). Stated another way, the clause "does not require that all persons receive identical treatment, but only that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." 284 Kan. at 372.

This court engages in a three-step process in reviewing an equal protection claim:

"First, it considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. If the statute treats '"arguably indistinguishable"' individuals differently, the court determines next the appropriate level of scrutiny to assess the classification by examining its nature or the right at issue. Then, the court applies that level of scrutiny to the statute. [Citations omitted.]" *State v. LaPointe*, 309 Kan. 299, 316, 434 P.3d 850 (2019).

Before addressing the parties' arguments, it helps to summarize a recent case from this court that both parties discuss, *State v. Dixon*, 60 Kan. App. 2d 100. Dixon, like Myers, had two criminal cases that were consolidated for trial based on the State's motion that the two cases could have been charged in one charging document. A jury convicted Dixon of all charges across both cases. The district court sentenced Dixon separately in both cases, designating a base sentence in each case and imposing consecutive sentences on the remaining counts. On appeal, Dixon raised an equal protection challenge to K.S.A. 2020 Supp. 21-6819(b)(4), the provision known as the "double rule," arguing that the double rule, which applied to multiple convictions brought in one charging document, treated one class of defendants—those with multiple counts charged in one charging document—differently than another class—those with multiple cases consolidated for

41

trial because the charges could have been brought in one charging document. 60 Kan. App. 2d at 130.

This court found merit in Dixon's argument that the double rule treated arguably indistinguishable classes of individuals differently. 60 Kan. App. 2d at 134. The court explained that both classes proceeded to one trial on multiple charges that were "'of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.'" 60 Kan. App. 2d at 134 (quoting K.S.A. 22-3202[1]). But only those defendants who had their charges brought in one charging document benefited from the double rule. The panel found the only difference between the two classes of defendants was the number of case numbers attached to the charges. 60 Kan. App. 2d at 134.

The panel then proceeded to the next step of the equal protection analysis— determining whether the double rule passed rational basis scrutiny. Dixon acknowledged that the double rule had a legitimate goal when applied to separate charging documents containing unrelated charges but argued the rule had no legitimate purpose "when there was one trial because the charges could have been brought in one charging document, but the State declined to do so." 60 Kan. App. 2d at 136. The panel acknowledged that the decision to proceed to a consolidated trial was a discretionary decision for the prosecutor but found that if the prosecutor elected to proceed to a consolidated trial because the prosecutor could have brought the charges in one charging document, then Dixon should receive the same sentencing benefit he would have a right to receive had the charges been brought in one charging document. 60 Kan. App. 2d at 136-37. The panel concluded that it was the State's arbitrary decision to charge the crimes in separate criminal cases that led to the sentencing disparity in Dixon's case. 60 Kan. App. 2d at 137.

The panel found that had the double rule been applied to Dixon as though he had been charged in one charging document, he would have received a maximum sentence of

42

1,306 months' imprisonment, which was more than 700 months, or about 61 years, less than the sentence he received because the district court applied a base sentence—and the double rule—in each case. 60 Kan. App. 2d at 139. Thus, the panel found that the double rule, as applied to Dixon's case, violated his equal protection rights:

> "We are mindful that the rational basis test is a very lenient standard and a statute must be enforced as written 'if any state of facts reasonably may be conceived to justify it.' [Citation omitted.] But we are unable to find that the strict application of K.S.A. 2020 Supp. 21-6819(b)(4) to Dixon's case implicates any legitimate sentencing goal. As a result, we find that the statute, as applied to Dixon's cases, does not pass rational basis scrutiny." 60 Kan. App. 2d at 139.

The panel concluded that the proper remedy was to extend the double rule to cases that are consolidated for trial because they could have been charged in one charging document. 60 Kan. App. 2d at 139-40. The panel stated:

> "We note that our decision does not stand for the proposition that the State must always consolidate cases for trial when they are related. Instead, our decision stands for the proposition that when the State chooses to consolidate cases for trial because the charges could have been brought in one charging document, then the State must be held to the sentencing limitations applicable to a trial based on one charging document." 60 Kan. App. 2d at 140.

In *Dixon*, the double rule under K.S.A. 2020 Supp. 21-6819(b)(4) was violated. Myers' sentences in his two cases did not violate the double rule. But the issue here is whether a sentencing court should sentence a defendant in separate cases designating a primary crime and a base sentence in each case when the cases were consolidated for trial because the charges could have been brought in a single complaint. As we will see in Myers' cases, using this sentencing procedure results in a longer controlling sentence than he would have received had all the charges been brought in one charging document.

*Do the base sentence rules treat arguably indistinguishable classes of individuals differently?*

Myers argues that the base sentence rules in K.S.A. 2020 Supp. 21-6819(b) distinguish between two similarly situated defendants: (1) defendants who had one trial on multiple counts charged in one case and (2) defendants who had one trial on multiple counts charged in separate cases consolidated for trial based on a finding that the charges *could have* been brought in one charging document. He asserts the first group benefits from the base sentence rules by having only one base sentence while the second class has a base sentence for each case. He argues the only distinction between these two classes of defendants is that the latter class has multiple case numbers attached to the charges.

The State argues that Myers' argument is really a challenge to prosecutorial discretion. The State argues that there is a distinction between Myers and defendants who have one trial on counts in a single document: his cases could have been tried separately because the cases were not subject to compulsory joinder.

Myers bears the burden of establishing that he is similarly situated to members of a class receiving different treatment. *State v. Cheeks*, 298 Kan. 1, 5, 310 P.3d 346 (2013), *overruled on other grounds by State v. LaPointe*, 309 Kan. 299, 316, 434 P.3d 850 (2019). In conducting review, this court is "limited 'by the distinctions argued by the complaining party.'" *Cheeks*, 298 Kan. at 5. Our Supreme Court has recognized that "[d]etermining whether individuals are similarly situated is 'not always susceptible to ease of application.'" 298 Kan. at 5.

The State is correct that Myers' cases were not consolidated under compulsory joinder and his cases could have been tried separately. But that does not undermine Myers' argument that when the State *chooses* to consolidate the cases because it could have brought the charges in one charging document, he should be treated similarly—

44

sentenced with only one base sentence—to those defendants who were charged in one charging document. His argument, like Dixon's, is persuasive.

The State moved, and the district court granted, consolidation under K.S.A. 22-3203, which states: "The court may order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment." Crimes can be charged in the same charging document "if the crimes charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." K.S.A. 22-3202(1). Thus, both classes of defendants identified by Myers had multiple convictions after one trial because the crimes charged were of the same or similar character or stemmed from the same act or transaction or two or more acts or transactions constituting parts of a common scheme or plan.

But only defendants who have their charges brought in a single case, or in one charging document, get the benefit of a single base sentence for multiple convictions. When a defendant is charged in two separate cases, even though the charges are later consolidated for one trial because they *could have* been brought in a single complaint, the defendant is sentenced separately in each case and receives a base sentence in each case, leading to a longer controlling sentence. As in *Dixon*, the only difference between the two classes of defendants is the number of case numbers attached to the charges.

We find the base sentence rules in K.S.A. 2020 Supp. 21-6819(b) treat arguably indistinguishable classes of defendants differently. We must now proceed to the next step in the analysis to determine the appropriate level of scrutiny to assess to the classification and decide whether K.S.A. 2020 Supp. 21-6819(b) passes that level of scrutiny.

*Do the base sentence rules in K.S.A. 2020 Supp. 21-6819(b) pass rational basis scrutiny?*

Both parties agree that because the statute does not involve suspect or quasi-suspect classes, rational basis scrutiny applies. The rational basis test is "'a very lenient standard.'" *Denney*, 278 Kan. at 651. "'For a statute to pass constitutional muster under the rational basis standard, it therefore must meet a two-part test: (1) It must implicate legitimate goals, and (2) the means chosen by the legislature must bear a rational relationship to those goals. '" 278 Kan. at 651. The test is only violated when the classification "'rests on grounds wholly irrelevant to the achievement of the State's legitimate objective'" and the statute will not "'be set aside if any state of facts reasonably may be conceived to justify it.'" 278 Kan. at 651-52. Myers bears the burden of "negating "'every conceivable [reasonable] basis which might support"' the differing treatment. [Citation omitted.]" See *Cheeks*, 298 Kan. at 8.

Myers cites *Dixon* and argues that applying the base sentence rules in K.S.A. 2020 Supp. 21-6819(b) to each case despite the cases being consolidated for trial because the charges could have been brought in one charging document is an arbitrary distinction. He argues that the distinction allows the State to secure harsher sentences by charging defendants in multiple cases but proceeding to only one trial.

Myers' cases show the sentencing disparity he is talking about. Myers received a base sentence of 618 months' imprisonment for attempted first-degree murder in 18CR941. Myers received a base sentence of 228 months' imprisonment for criminal discharge of a firearm in 18CR1664. He also received a consecutive term of 9 months' imprisonment for criminal possession of a weapon by a convicted felon for a controlling sentence in 18CR1664 of 237 months' imprisonment. The district court ordered the sentences in the two cases to run consecutive for a total term of 855 months' imprisonment. Had the charges been filed in one complaint, Myers' presumptive sentence range for criminal discharge of a firearm would have been 61-59-55 months'

imprisonment, calculated using a criminal history score of I. See K.S.A. 2020 Supp. 21-6819(b)(5). In other words, even assuming the high range on the sentencing grid, Myers' sentence for that count would have been at least 167 months less than the 228-month base sentence he received (228-61=167). Even if the district court ran the same counts in the two cases consecutive, Myers' total term would have been 688 months' imprisonment instead of the 855-month sentence he received (618+61+9=688).

The State filed the complaint in case 18CR941 on May 25, 2018, for the crimes arising from the April 2018 shooting. The State filed the complaint in case 18CR1664 on June 26, 2018, for the crimes arising from the February 2017 shooting. Interestingly, the report on the shell casings recovered from Carter's house was completed on May 21, 2018. It was within the State's discretion to file the two cases separately. But the State later consolidated the cases for trial because all the charges *could have* been brought in a single complaint under K.S.A. 22-3202(1). As a result of the State's decision to file the complaints separately, Myers ultimately received a sentence that was 167 months longer than the sentence he would have received for the same convictions had all the charges originally been filed in a single complaint. As reasoned in *Dixon*, this sentencing disparity based solely on the number of cases attached to the charges at a consolidated trial seems to defeat the KSGA's purpose of uniform sentencing. See *State v. Fowler*, 311 Kan. 136, 152, 457 P.3d 927 (2020) ("[T]he Legislature's stated policy goal[] in enacting the KSGA [is] uniformity in sentencing.").

The State argues there are rational reasons for the different treatment. The State asserts that "[i]t is perfectly logical and reasonable to allow for harsher sentences for offenders, such as defendant, who victimize multiple people on different occasions." The State asserts the consolidation promotes judicial economy and that such economy should not result in a "windfall" at sentencing for defendants. The State also argues that Myers' arguments will require "the State to make a choice it should not be forced to make which will lead to alternative Equal Protection claims from defendants." The State asserts that

defendants will now have an incentive to have their cases consolidated for trial and if the cases are not consolidated, defendants will argue they should have been, creating a "Catch 22" for the State. The State argues that the KSGA already provides defendants with a "significant benefit" under K.S.A. 2020 Supp. 21-6810(a), which provides that counts joined for trial under K.S.A. 22-3203 and amendments thereto do not count as prior convictions in determining the defendant's criminal history.

The State's arguments are unpersuasive. To begin, we agree with the State that prosecutors have wide discretion in charging decisions. As this court stated in *Dixon*:

> "[W]e recognize that a prosecutor is the representative of the State in criminal prosecutions and has broad discretion in controlling those prosecutions. The scope of this discretion extends to the power to investigate and to determine who shall be prosecuted and what crimes shall be charged. [Citations omitted.] The discretion to decide what charges to file in any situation is an important tool reserved to the prosecutor, and courts should not try to interfere with such discretion, nor do we have the power to do so." 60 Kan. App. 2d at 136-37.

Although we agree the prosecutor has charging discretion, the State's argument that a defendant who victimizes multiple people on different occasions deserves a harsher sentence misses the point. While the crimes Myers committed victimized different people on different occasions, the State ultimately consolidated the cases for trial because they were of the same or similar character and could have been charged in one charging document. Thus, it was the State's discretionary but arbitrary decision to originally file similar charges—that could have been brought in one charging document—in separate charging documents that led to the sentencing disparity in this case.

The State's judicial economy argument is also problematic. Judicial economy supports consolidating cases for trial, but it does not support the disparate sentencing treatment that results from consolidation, especially considering that the goal of the

KSGA is uniformity in sentencing. See *Fowler*, 311 Kan. at 152. Again, Myers is not asserting that the State cannot consolidate cases for trial. He is merely asserting that if the State chooses to consolidate cases for trial because the State could have charged the crimes in one charging document, then the cases should be sentenced as if they were in fact brought in one charging document. Disparate sentencing based solely on the number of cases attached to charges bears no rational relationship to promoting judicial economy.

We also disagree that sentencing Myers as though all the charges for which he was convicted had been filed in one complaint results in a "windfall" for him. Myers only received one trial and the consolidation of the cases provided the State with a significant procedural and strategic advantage at trial. The jury found Myers guilty of all the charges. As it stands, Myers received a sentence that was 167 months longer than the sentence he would have received for the same convictions had all the charges originally been filed in a single complaint. Myers simply argues that if he is to be tried as though all the charges against him had been filed in one complaint, he should be sentenced as though all the charges were filed in one complaint. There is no windfall here.

The State's arguments about forcing it to make a choice that may lead to different equal protection claims in the future is also not persuasive. First, it seems that speculating on the possibility of future equal protection claims if there is a ruling in Myers' favor is hypothetical. And as for defendants now having an incentive to ask for consolidated trials, if all the charges against a defendant are of the same or similar character, then a consolidated trial is appropriate and should be considered whether the request is made by the defendant or by the State. Second, a ruling in Myers' favor will not force the State to make a decision it should not have to make. The only choice the State will need to make is whether it should try two cases separately and receive the full benefit of the base sentence rules or consolidate the cases for trial with the understanding that the defendant will be sentenced as though the charges had been brought in one case.

49

Finally, the State points to the "significant benefit" the defendant already receives under K.S.A. 2020 Supp. 21-6810(a), which provides that counts joined for trial under K.S.A. 22-3203 and amendments thereto do not count as prior convictions in determining criminal history. But we see this argument as working against the State and not in its favor. The Kansas Legislature seems to recognize that when a defendant is convicted of charges in separate complaints that were consolidated for trial because the charges could have been brought in one charging document, it is inappropriate to count the convictions against each other in determining criminal history. This KSGA provision shows some acknowledgment by the Legislature that at least in terms of determining criminal history, a defendant who is tried as though all the charges could have been brought in one complaint should be sentenced as though all the charges were brought in one complaint.

As we observed in *Dixon*, 60 Kan. App. 2d at 139, "[w]e are mindful that the rational basis test is a very lenient standard, and a statute must be enforced as written 'if any state of facts reasonably may be conceived to justify it.'" (quoting *Denney*, 278 Kan. at 652). But we are unable to find that the strict application of K.S.A. 2020 Supp. 21-6819(b) to Myers' cases implicates any legitimate sentencing goal. As a result, we find that the statute, as applied to Myers' cases, does not pass rational basis scrutiny. Thus, we conclude that the base sentence rules found in K.S.A. 2020 Supp. 21-6819(b), as applied to Myers' cases, violates his equal protection rights under the Fourteenth Amendment. Our final step is to determine the remedy for this violation.

*What is the remedy for this violation?*

There are two remedies when a statute is under-inclusive: (1) either declare the statute void or (2) order that its benefits include the aggrieved class. *Denney*, 278 Kan. at 656. To decide between the two remedies, the court should look at the importance of the statute and the effects of striking it down. 278 Kan. at 656.

50

Given the two remedies, it would be more consistent with the purpose of the KSGA to extend the coverage of the statute as opposed to striking it down. Such a remedy has been taken in other cases. See, e.g., *Denney*, 278 Kan. at 660 (extending coverage of statute to aggrieved class finding the remedy better than nullifying the statute); *Dixon*, 60 Kan. App. 2d at 140 (expanding coverage of double rule found in K.S.A. 2020 Supp. 21-6819[b][4] to defendants who had a consolidated trial based on a finding that the charges could have been brought in one charging document); *State v. Kelsey*, 51 Kan. App. 2d 819, 829, 356 P.3d 414 (2015) (expanding coverage of statute to cover narrow class at issue after equal protection challenge).

In sum, we vacate Myers' sentences and remand for resentencing with the court designating one primary crime of conviction—attempted first-degree murder—and only one base sentence for both cases. Contrary to the State's argument, our decision does not stand for the proposition that the State must always consolidate cases for trial when they are related. Instead, we merely hold that when the State chooses to consolidate cases for trial because the charges could have been brought in one charging document, then the State must be held to the sentencing limitations—applying only one base sentence—applicable to a trial based on one charging document. See *Dixon*, 60 Kan. App. 2d at 140 (reasoning same in relation to double rule).

DID THE DISTRICT COURT ERR IN CALCULATING MYERS' CRIMINAL HISTORY SCORE?

Myers argues, for the first time on appeal, that the district court erred in finding his criminal history score was B because the State did not present evidence that he had counsel or waived counsel for his prior misdemeanor convictions. See K.S.A. 2020 Supp. 21-6811(a) (allowing three prior misdemeanor convictions to be aggregated to one person felony conviction). Myers concedes that he withdrew any objection to the PSI report and personally affirmed that he did not object to a criminal history score of B. But Myers argues that the State had the burden to prove his criminal history score, including whether

his misdemeanor convictions were counseled or that he waived counsel and because the State did not meet this burden, his case must be remanded.

The State correctly asserts that the Kansas Supreme Court recently rejected the same claim in *State v. Roberts*, 314 Kan. 316, 498 P.3d 725 (2021). In *Roberts*, the defendant claimed for the first time on appeal that the State failed to prove that his three prior municipal convictions were counseled or that he waived counsel and thus his sentence was illegal. Roberts admitted his criminal history in the PSI report and never notified the court of any alleged error. Our Supreme Court reaffirmed that "'[a] person accused of a misdemeanor has a Sixth Amendment right to counsel if the sentence to be imposed upon conviction includes a term of imprisonment, even if the jail time is suspended or conditioned upon a term of probation,'" and that uncounseled misdemeanor convictions cannot be used in subsequent criminal proceedings. 314 Kan. at 320.

The *Roberts* court stated that resolution of the issue depended on who had the burden of proving the validity of prior convictions: the State or the defendant. 314 Kan. at 321. The court found that under K.S.A. 2020 Supp. 21-6814, the State satisfies its initial burden of proving an offender's criminal history by providing the PSI report. If the offender provides written notice of any error in the PSI report, then the State must prove the disputed portion of the criminal history. But if the offender does not object to any errors in the PSI report, the report satisfies the State's burden of proving criminal history, and the burden shifts to the offender to prove any error in the alleged criminal history by a preponderance of the evidence. 314 Kan. at 322. The court then held:

> "[A] defendant who fails to object under K.S.A. 2020 Supp. 21-6814(c) at sentencing to the constitutional validity of a prior conviction used to enhance a current sentence, based on a claim of the absence of counsel without a valid waiver, has the burden to show the prior conviction is invalid, regardless of whether the defendant's constitutional challenge to the allegedly uncounseled conviction in criminal history is brought on direct appeal of

52

the current sentence or in a proceeding collaterally attacking that sentence." 314 Kan. at 334-35.

The court elaborated that without an objection at sentencing, "a presumption of regularity attaches to a final judgment entered in a prior case and the defendant bears the burden of producing evidence to rebut that presumption." 314 Kan. at 335. The court found that because Roberts admitted his criminal history at sentencing and did not object, the PSI report satisfied the State's burden to prove the constitutional validity of his prior misdemeanor convictions and Roberts had the burden to show in his direct appeal that the prior convictions were constitutionally invalid. 314 Kan. at 336; see also *State v. Corby*, 314 Kan. 794, 502 P.3d 111 (2022) (applying same analysis to defendant's criminal history challenge in direct appeal).

Identical to *Roberts*, Myers personally admitted his criminal history at sentencing after withdrawing his objection to his criminal history. Because Myers admitted his criminal history, the PSI report met the State's burden of proving the validity of his prior convictions, including the three misdemeanor convictions. Thus, Myers bears the burden in this, his direct appeal, to show the prior convictions were invalid. But Myers does not claim, let alone point to evidence to establish, that his prior misdemeanor convictions were uncounseled. As a result, Myers is entitled to no relief on this claim in his direct appeal. But we observe that Myers may still move to correct his alleged illegal sentence, and in such a motion he will have the burden of proving his misdemeanor convictions were uncounseled, resulting in a different criminal history score and an illegal sentence.

Convictions affirmed, sentences vacated, and case remanded with directions.